STATE OF CONNECTICUT *v.* JOSE GARCIA
(15128)

PETERS, C. J., and BORDEN, BERDON, KATZ and PALMER, Js.

*(One justice concurring separately)*

Argued January 10—decision released May 9, 1995

*Monte P. Radler*, assistant public defender, for the appellant (defendant).

*Judith M. Rossi*, assistant state's attorney, with whom, on the brief, were *Eugene Callahan*, state's attorney, and *David I. Cohen*, senior assistant state's attorney, for the appellee (state).

*Thomas A. Behrendt* filed a brief for the Connecticut Legal Rights Project, Inc., as amicus curiae.

BORDEN, J. The principal issue in this appeal is whether a criminal defendant who has been found incompetent to stand trial pursuant to General Statutes § 54-56d[1] may be involuntarily medicated with

---

[1] General Statutes § 54-56d provides: "COMPETENCY TO STAND TRIAL. (a) COMPETENCY REQUIRED. DEFINITION. A defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense.

"(b) PRESUMPTION OF COMPETENCY. A defendant is presumed to be competent. The burden of proving that the defendant is not competent by clear and convincing evidence and the burden of going forward with the evidence

antipsychotic drugs in order to render him competent to stand trial, and if so, under what circumstances. The

are on the party raising the issue. The burden of going forward with the evidence shall be on the state if the court raises the issue. The court may call its own witnesses and conduct its own inquiry.

"(c) REQUEST FOR EXAMINATION. If at any time during a criminal proceeding it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency.

"(d) EXAMINATION OF DEFENDANT. REPORT. If the court finds that the request for an examination is justified and that, in accordance with procedures established by the judges of the superior court, there is probable cause to believe that the defendant has committed the crime for which he is charged, the court shall order an examination of the defendant as to his competency. The court either may appoint one or more physicians specializing in psychiatry to examine the defendant or it may order the commissioner of mental health to conduct the examination either by a clinical team consisting of a physician specializing in psychiatry, a clinical psychologist and a psychiatric social worker, or by one or more physicians specializing in psychiatry. If the commissioner of mental health is ordered to conduct the examination, he shall select the members of the clinical team or the physician or physicians. If the examiners determine that the defendant is not competent, they shall then determine whether there is substantial probability that the defendant, if provided with a course of treatment, will regain competency within the maximum period of any placement order under this section. The court may authorize a physician specializing in psychiatry, a clinical psychologist or a psychiatric social worker selected by the defendant to observe the examination. Counsel for the defendant may observe the examination. The examination shall be completed within fifteen days from the date it was ordered. The examiner or examiners shall prepare and sign, without notarization, a written report and file it with the court within ten days of the completion of the examination. On receipt of the written report, the clerk of the court shall cause copies to be delivered immediately to the state's attorney and to counsel for the defendant.

"(e) HEARING. The court shall hold a hearing as to the competency of the defendant no later than ten days after it receives the written report. Any evidence regarding the defendant's competency, including the written report, may be introduced at the hearing by either the defendant or the state. If the written report is introduced, at least one of the examiners must be present to testify as to the determinations in the report, unless his presence is waived by the defendant and the state. Any member of the clinical team shall be considered competent to testify as to the team's determinations. A defendant and his counsel may waive the court hearing only if the examiners, in the written report, determine without qualification that the defendant is competent.

defendant, Jose Garcia, appeals from an order of the trial court permitting the Whiting Forensic Institute

"(f) COURT FINDING OF COMPETENCY OR INCOMPETENCY. If the court, after the hearing, finds that the defendant is competent, it shall continue with the criminal proceedings. If it finds that the defendant is not competent, it shall also find whether there is substantial probability that the defendant, if provided with a course of treatment, will regain competency within the maximum period of any placement order permitted under this section.

"(g) COURT PROCEDURE IF FINDING THAT DEFENDANT WILL NOT REGAIN COMPETENCY. If, at the hearing, the court finds that there is not a substantial probability that the defendant, if provided with a course of treatment, will regain competency within the period of any placement order under this section, the court shall follow the procedure set forth in subsection (m) of this section.

"(h) COURT PROCEDURE IF FINDING THAT DEFENDANT WILL REGAIN COMPETENCY. If, at the hearing, the court finds that there is a substantial probability that the defendant, if provided with a course of treatment, will regain competency within the period of any placement order under this section, the court shall order placement of the defendant for treatment for the purpose of rendering him competent.

"(i) PLACEMENT FOR TREATMENT. CONDITIONS. The placement for treatment for the purpose of rendering the defendant competent shall comply with the following conditions: (1) The period of placement under the order or combination of orders shall not exceed the period of the maximum sentence which the defendant could receive on conviction of the charges against him or eighteen months, whichever is less; (2) the placement shall be either in the custody of the commissioner of mental health, the commissioner of children and families or the commissioner of mental retardation or, if the defendant or the appropriate commissioner agrees to provide payment, in the custody of any appropriate mental health facility or treatment program which agrees to provide treatment to the defendant and to adhere to the requirements of this section and (3) the court shall order the placement, on either an inpatient or an outpatient basis, which it finds is the least restrictive placement appropriate and available to restore competency. If outpatient treatment is the least restrictive placement for a defendant who has not yet been released from a correctional facility, the court shall consider whether the availability of that treatment is a sufficient basis on which to release the defendant on a promise to appear, conditions of release, cash bail or bond. If the court determines that the defendant may not be so released, the court shall order treatment of the defendant on an inpatient basis at a mental health facility or mental retardation facility.

"(j) PROGRESS REPORTS RE TREATMENT. The person in charge of the treatment facility or his designee shall submit a written progress report to the court (1) at least seven days prior to the date of any hearing on the issue of the defendant's competency; (2) whenever he believes that the defend-

(Whiting) to treat him with antipsychotic medication in order to attempt to restore him to competency to

ant has attained competency; or (3) whenever he believes that there is not a substantial probability that the defendant will attain competency within the period covered by the placement order. The progress report shall contain (A) the clinical findings of the person submitting the report and the facts on which the findings are based; (B) the opinion of the person submitting the report as to whether the defendant has attained competency or as to whether the defendant is making progress, under treatment, toward attaining competency within the period covered by the placement order; and (C) any other information concerning the defendant requested by the court, such as the method of treatment or the type, dosage and effect of any medication the defendant is receiving.

"(k) RECONSIDERATION OF COMPETENCY. HEARING. When any placement order for treatment is rendered or continued, the court shall set a date for a hearing, to be held within ninety days, for reconsideration of the issue of the defendant's competency. Whenever the court receives a report pursuant to subsection (j) which indicates either that (1) the defendant has attained competency, or that (2) the defendant will not attain competency within the remainder of the period covered by the placement order, the court shall set the matter for a hearing no later than ten days after the report is received. The hearing may be waived by the defendant only if the report indicates that he is competent. The court shall determine whether the defendant is competent or whether he is making progress toward attainment of competency within the period covered by the placement order. If the court finds that the defendant is competent, he shall be returned to the custody of the commissioner of correction or released, if he has met the conditions for release, and the court shall continue with the criminal proceedings. If the court finds that the defendant is still not competent but that he is making progress toward attaining competence, it may continue or modify the placement order.

"(*l*) FAILURE OF DEFENDANT TO RETURN TO TREATMENT FACILITY. If a defendant who has been ordered placed for treatment on an inpatient basis at a mental health facility or mental retardation facility is released from such facility on a furlough or for work, therapy or any other reason and fails to return to the facility in accordance with the terms and conditions of his release, the person in charge of the facility or his designee shall, within twenty-four hours of the defendant's failure to return, report such failure to the prosecuting authority for the court location which ordered the placement of the defendant. Upon receipt of such a report, the prosecuting authority shall, within available resources, make reasonable efforts to notify any victim or victims of the crime for which the defendant is charged of such defendant's failure to return to the facility. No civil liability shall be incurred by the state or the prosecuting authority for failure to notify any victim or victims in accordance with this subsection. The failure of a defend-

stand trial. The defendant claims that the trial court's order violated his rights under the federal and state

ant to return to the facility in which he has been placed may constitute sufficient cause for his rearrest upon order by the court.

"(m) RELEASE OR PLACEMENT OF DEFENDANT WHO WILL NOT BECOME COMPETENT. If at any time the court determines that there is not a substantial probability that the defendant will become competent within the period of treatment allowed by this section, or if at the end of that period the court finds that the defendant is still not competent, the court shall either release the defendant from custody or order the defendant placed in the custody of the commissioner of mental health, the commissioner of children and families or the commissioner of mental retardation. The commissioner given custody or his designee shall then apply for civil commitment according to sections 17a-75 to 17a-83, inclusive, 17a-270 to 17a-283, inclusive, 17a-450 to 17a-484, inclusive, 17a-495 to 17a-528, inclusive, 17a-540 to 17a-550, inclusive, 17a-560 to 17a-576, inclusive, 17a-615 to 17a-618, inclusive, or 46a-11a to 46a-11g, inclusive. The court shall hear arguments as to whether the defendant should be released or should be placed in the custody of the commissioner of mental health, the commissioner of children and families or the commissioner of mental retardation. The court shall dismiss, with or without prejudice, any charges for which a nolle prosequi is not entered when the time within which the defendant may be prosecuted for the crime with which he is charged, as provided in section 54-193, has expired. Notwithstanding the erasure provisions of section 54-142a, police and court records and records of any state's attorney pertaining to a charge which is nolled or dismissed without prejudice while the defendant is not competent shall not be erased until the time for the prosecution of the defendant expires under section 54-193. A defendant who is not civilly committed as a result of an application made by the commissioner of mental health, the commissioner of children and families or the commissioner of mental retardation pursuant to this section shall be released. A defendant who is civilly committed pursuant to such an application shall be treated in the same manner as any other civilly committed person.

"(n) PAYMENT OF COSTS. The cost of the examination effected by the commissioner of mental health and of testimony of persons conducting the examination effected by the commissioner shall be paid by the department of mental health. The cost of the examination and testimony by physicians appointed by the court shall be paid by the judicial department. If the defendant is indigent, the fee of the person selected by the defendant to observe the examination and to testify on his behalf shall be paid by the Public Defender Services Commission. The expense of treating a defendant placed in the custody of the commissioner of mental health, the commissioner of children and families or the commissioner of mental retardation pursuant to subsection (i) of this section shall be computed and paid for in the same

constitutions because the trial court did not properly balance his liberty interest in being free from unwanted medication against the state's interest in determining his guilt or innocence. We conclude that, under certain circumstances, a defendant in a criminal case may be medicated against his will in order to restore him to competency, and we remand the case for consideration pursuant to the standards articulated hereinafter as to whether compelled medication is appropriate in this case.

This case comes before us with the following factual and procedural background. On January 30, 1993, the defendant was arrested and charged with the crimes of murder pursuant to General Statutes § 53a-54a,[2]

manner as is provided for persons committed by a probate court under the provisions of sections 17b-19, 17b-63 to 17b-65, inclusive, 17b-115 to 17b-138, inclusive, 17b-220 to 17b-250, inclusive, 17b-256, 17b-259, 17b-263, 17b-287, 17b-340 to 17b-350, inclusive, 17b-689 to 17b-693, inclusive, and 17b-743 to 17b-747, inclusive.

"(o) CUSTODY OF DEFENDANT. Until the hearing is held, the defendant, if not released on a promise to appear, conditions of release, cash bail or bond, shall remain in the custody of the commissioner of correction unless hospitalized as provided in sections 17a-512 to 17a-517, inclusive.

"(p) PLACEMENT OF VIOLENT DEFENDANT. This section shall not be construed to require the commissioner of mental health to place any violent defendant in a mental institution which does not have the trained staff, facilities and security to accommodate such a person. If placement in such a facility becomes necessary, a state policeman shall be provided to guard the defendant after placement in such an institution.

"(q) DEFENSE OF DEFENDANT PRIOR TO TRIAL. This section shall not prevent counsel for the defendant from raising, prior to trial and while the defendant is not competent, any issue susceptible of fair determination.

"(r) CREDIT FOR CONFINEMENT TIME. Actual time spent in confinement on an inpatient basis pursuant to this section shall be credited against any sentence imposed on the defendant in the pending criminal case or in any other case arising out of the same conduct in the same manner as time is credited for time spent in a correctional facility awaiting trial."

[2] General Statutes § 53a-54a provides: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the pro-

felony murder pursuant to General Statutes § 53a-54c,[3] and robbery in the first degree pursuant to General Statutes §§ 53a-133[4] and 53a-134 (a) (2).[5] The charges

scribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d."

[3] General Statutes § 53a-54c provides: "FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[4] General Statutes § 53a-133 provides: "ROBBERY DEFINED. A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

[5] General Statutes § 53a-134 (a) (2) provides: "ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first

were brought in connection with the stabbing death of Mario Lopez on January 30, 1993. On August 27, 1993, the defendant filed a "Notice of Intention to Introduce Expert Testimony Relating to Mental Disease or Defect or Other Condition Relating to Mental State." The trial court, *Dean, J.*, ordered a competency evaluation pursuant to § 54-56d,[6] and subsequently, on September 23, 1993, found the defendant incompetent to stand trial. The defendant was committed to the custody of the commissioner of mental health for a period of three months for inpatient treatment in order to restore competency.

On January 11, 1994, the trial court, *Nigro, J.*, held a hearing at which it heard the testimony of Timothy G. Schumacher, a clinical psychologist on the staff of the Whiting diagnostic unit, where the defendant was confined for treatment. Schumacher testified, in accordance with the clinical team's evaluation,[7] that the defendant needed treatment with antipsychotic medication in order to restore his competency. Although, in the team's opinion, the defendant needed to take the medication on a regular basis, he had taken it only intermittently, which had yielded no positive therapeutic effect. Schumacher testified that, although the defendant understood the nature of the proceedings against him, he lacked the capacity to assist in his own defense. Schumacher further indicated that there was a substantial probability that the defendant could be restored to competency if he were medicated, but that there was no "guarantee" that the medication would be successful. The team's evaluation concluded by requesting that "the court consider legally direct-

---

degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

[6] See footnote 1.

[7] The clinical team's evaluation had been filed with the court.

ing the involuntary use of psychiatric medication as a measure to restore [the defendant] to competency."

The defendant objected to being medicated, arguing that there was no statutory authority for the court to make such an order and, in the alternative, that such an order could be entered only with appropriate deference to the defendant's constitutional rights. At the conclusion of the hearing, the trial court, *Nigro, J.*, found that: (1) the defendant was not competent to stand trial because he was unable to assist his counsel in his defense; (2) there was a reasonable probability that he could be restored to competency with antipsychotic medication; and (3) because the defendant had refused such treatment, it might be necessary forcibly[8] to medicate him. Accordingly, the court entered an order allowing Whiting to medicate the defendant involuntarily (medication order), but stayed the order to give the defendant the opportunity to present argument that such an order was contrary to law.

On January 18, 1994, the defendant sought to vacate the medication order and moved for a full evidentiary hearing on the issue of forced medication, claiming that the court, in reaching its decision, had failed adequately to consider the substantive and procedural due process

---

[8] Although there was discussion in the trial court that the defendant would "voluntarily" take antipsychotic medication if ordered to do so by the court, an improper court order with which the defendant complies is no less an invasion of his rights than physically forcing compliance with such an improper order. In the determination as to whether a court order is proper, we see no basis, therefore, for distinguishing between forced medication, whereby the defendant is restrained and injected, and medication pursuant to a court order with which the defendant complies. The propensity of a defendant to comply with a court order, therefore, is not relevant to the question as to whether the state has invaded the liberty interests of the defendant. It may be relevant, however, to the factual determination as to whether involuntary medication is appropriate in a particular case. For example, experts in this case testified that in the case of a defendant suffering from a paranoid disorder, forcibly administering the medication could significantly reduce the effectiveness of treatment.

issues pertaining to the forced medication of the defendant. The defendant also moved for the appointment of a guardian to protect his medical interests.

At a hearing on January 20, 1994, the court stayed the medication order pending further argument on the defendant's due process concerns. The court did not decide the motion for appointment of a guardian, but indicated that it would entertain a motion for Attorney William Wynne of the Connecticut Legal Rights Project, Inc., to appear as amicus curiae in the defendant's competency proceedings. At the next hearing before the court, on April 28, 1994, the defendant moved that the court appoint the Connecticut Legal Rights Project, Inc., as special public defender, pursuant to General Statutes § 51-293,[9] to represent him on the issue of forced medication. The court determined

[9] General Statutes § 51-293 provides in relevant part: "PUBLIC DEFENDERS, ASSISTANTS AND DEPUTIES; APPOINTMENT, TERMS, QUALIFICATIONS, SUSPENSION, REMOVAL, SALARIES. SPECIAL ASSISTANT PUBLIC DEFENDERS. (a) (1) The commission shall appoint a public defender for each judicial district and a public defender who shall handle appellate matters and provide legal support services to public defender offices, each of whom shall serve as public defender in the superior court and as many assistant public defenders and deputy assistant public defenders for the superior court as the criminal or delinquency business of the court may require. (2) This section shall not prevent a judge of the superior court from appointing a special assistant public defender on a contractual basis for a temporary period of time in an appropriate case, whose expenses and compensation shall be paid from the budget of the Public Defender Services Commission and in accordance with the rates of compensation approved by the commission pursuant to subsection (1) of section 51-291. Whenever possible, any such appointment shall be made from a list of attorneys provided by the commission and submitted to the court by the office of the chief public defender. Subsequent to his appointment as a special assistant public defender, an attorney may not solicit or accept from or on behalf of his client any money or article of value of any kind either as a fee for services performed or to be performed or as payment for costs or expenses incurred or to be incurred. (3) At the direction of the chief public defender, any superior court public defender, assistant public defender, deputy assistant public defender or other person employed by the division of public defender services may be required to act in such capacity in another judicial district or geographical area when the demands of criminal business or delinquency proceedings necessitate it."

that the statute did not give it authority to make such an appointment, but stated that it would allow the Connecticut Legal Rights Project, Inc., to file an appearance as amicus curiae on the issue of forced medication.

The defendant produced evidence at the April 28, 1994 hearing in connection with his motion to vacate the medication order. The defendant presented Kenneth Selig, a forensic psychiatrist experienced in both the administration of antipsychotic medications and the evaluation of competency. Selig testified that he was familiar with the defendant's case, having examined both the defendant and his records, and that in his professional opinion, the defendant was in a psychotic state, was convinced that he was not mentally ill and believed that antipsychotic medication is poison. Selig also indicated that the defendant's condition was consistent with either organic brain damage, perhaps related to the defendant's history of alcohol abuse, or a psychiatric disorder such as schizophrenia or some other paranoid disorder. He further testified that while antipsychotic medication could be useful in the treatment of these psychiatric disorders, its only value in the treatment of organic brain damage is to control agitation or aggressive behavior, in which case it would not restore the defendant to competency.

According to Selig, in cases where the patient is given antipsychotic medication of the proper type at the proper dosage for the proper length of time, the success rate could be broken down as follows: approximately one third of the patients considerably improve; approximately one third stay the same; and approximately one third become worse. Selig also indicated that there is the potential for a multitude of side effects associated with antipsychotic medications including blurry vision, dry mouth, urinary retention, severe motion problems, confusion and reduction of blood pressure. Additionally, Selig indicated that the long term use of antipsychotic medication created a risk of tardive

dyskinesia, a repetitive involuntary motion disorder, and that a potentially fatal consequence, namely, neuroleptic malignant syndrome, occurs in less than 1 percent of cases.

Furthermore, according to Selig, although most people who receive forced medication are appreciative when they are helped by the treatment, there is a significant percentage of other patients who resent the intrusiveness, the side effects and the humiliation of forced medication. On cross-examination, Selig indicated that treatment with antipsychotic medication would be "the best bet" for a paranoid disorder, the only "real" possibility of restoring the defendant to competence, as long as the illness was not organic in nature, and that the only way to know whether medication would be successful was to try it. Selig also expressed concern that the procedure of forcibly medicating the defendant could exacerbate his paranoia in derogation of any positive effect the medication might otherwise have. The court then continued the hearing in order to allow the state to present a rebuttal witness.

At the next hearing, on August 10, 1994, the state presented the testimony of Earl Biassey, the treating psychiatrist on the defendant's treatment team at Whiting. Biassey indicated that, due to the defendant's refusal to cooperate, although the treatment team had been unable to perform the necessary testing and gather sufficient information to rule out any organic cause of the defendant's psychosis, several ascertainable factors pointed away from organic etiology. These included the defendant's lack of a memory deficit, lack of attention problems and lack of concentration problems. In contradiction of Selig, Biassey testified that even if the cause of the defendant's psychosis was organic, the defendant could benefit from treatment with antipsychotic medication because it could lessen his sense of confusion. Biassey stated that "[t]he sim-

plest and least troublesome treatment would be the use of . . . an antipsychotic medication." Biassey disagreed with Selig's estimate that only one third of patients improve as a result of medication with antipsychotic drugs, and offered his estimate that "[p]resently, with the use of medication the response rate of psychotic disorders is not different than the response to other medical things such as high blood pressure and so forth. That would make it somewhere between 75 and 78 percent response." Biassey also indicated that the defendant's sporadic use of the medication Navane made him more communicative and "pliable," and that this positive response indicated that, if taken as prescribed, the medication could make the defendant better able to work with counsel. Biassey further indicated that the defendant had "indicated that he wouldn't take [the medication], but if the court said he should, he would," and, thus, in his opinion, an order for involuntary medication would not require the use of physical force.

After hearing argument from the parties, the court, on August 10, 1994, made its oral ruling and findings. The court concluded that "[t]he nature of these charges are such that the community's interest in fairly and accurately determining the defendant's guilt or innocence outweighs whatever limited intrusion into the defendant's constitutional rights might exist as a result of [the] forcible administration of medication. . . . [T]he court determines that, if necessary the staff—medical staff, under appropriate supervision at . . . Whiting Forensic Institute, may administer [antipsychotic] medication, which that staff determines would be of assistance in restoring the defendant to competency."[10]

---

[10] The full transcript of the court's oral decision is as follows:

"Well, understand that the defendant has been committed to Whiting Forensic Institute for a limited purpose at this present time, which is to ascertain if he can be restored to competency for the purpose of standing trial under the statutory provisions of § 54-56b.

"The situation differs from commitments of private citizens to mental hospitals through Probate Court proceedings, where there is no particular

The court stayed the medication order for twenty days, but indicated that Whiting could medicate the

state interest, except, I suppose that we prefer to have people around who are sane rather than insane.

"In this case, the defendant is charged with the crime of murder. There is a substantial state interest in having the resolution as to whether or not the state can prove that the defendant is guilty of the crime of murder beyond a reasonable doubt. Just as there is a substantial interest of the defendant in ascertaining whether or not the state can prove that he is guilty beyond a reasonable doubt, otherwise be found not guilty. Or, in light of the pleadings that have been filed in this matter, whether or not, even if he committed the acts which amounted to murder, he is still not guilty of a crime because of the lack of mental ability to conform his conduct to the standards required for an insanity defense.

"But, that trial can never be had . . . as long as the defendant . . . has been determined by competent medical authorities to be incompetent to stand trial.

"There is, therefore, in this type of situation a substantial state interest in having the defendant—in having a trial on this issue—in having the defendant found either guilty or not guilty. With also the understanding that a defendant who is incompetent in assisting in his own defense, much less understanding the nature of the proceedings against him—this defendant seems to be capable of doing that—cannot be tried. And, his guilt or non-guilt cannot be determined. The testimony that this court has is that if he is to be restored to competency under the provisions of § 54-56d the least intrusive mode of restoring to competency would be treatment at a psychiatric hospital. The testimony we have also had at this point, both in the previous hearing on the § 54-56d determination and today, is that the technique for restoring to competency that is least intrusive would be medication by psychotropic medication.

"The medication that might be administered would only under extreme circumstances—would be life-threatening. Generally, the side effects that might manifest themselves would be relatively minor. And, in most situations not life-threatening.

"The court also considers that medication is being administered by competent, licensed, physicians or psychiatrists and staff, under the supervision of the physicians at Whiting Forensic Institute.

"It is also apparent to this court that it is in the defendant's interest as well to have the E.E.G.s that he has refused up to this point. And, to undergo the psychological testing—both of which might tend to demonstrate whether or not the defendant is suffering from organic brain damage.

"The—of course, there is conflict in testimony by both the defense psychiatrist and the state psychiatrist as to whether or not, if the defendant is suffering from organic brain damage, the administration of the psychotropic medicine would have any benefit. The testimony today is that

defendant to control violence or to treat physical

in 75 to 80 percent—75 to 80 percent of the use of medication prescinding from organic brain damage, the use of medication has been successful in restoring a person deemed incompetent to stand trial to the status of competency. The literature has been cited to that effect; as well as the experience of the witness in his years at Whiting Forensic Institute.

"The witness has also indicated that the possibility of restoration to competency, even if there exists some degree of organic brain damage, is likely. The court has had that experience in a recent case as well, in *State* v. *Raguseo*, [225 Conn. 114, 622 A.2d 519 (1993)] where there was a claim of organic brain damage but the defendant was ascertained competent to stand trial—the—after [§ 54-56d] examination and treatment.

"So, there is a reasonable degree of medical certainty that the medication would enable the defendant to be restored to competency—the administration of the medication. There is a substantial state interest in having the defendant restored to competency which must be balanced against the defendant's interest in not being required to submit to forcible administration of the medication.

"However, in these particular circumstances as well, it is in the interest of the defendant to be restored to competency. If the—and I assume that the defense of insanity is a viable defense in this case. Because I assume that a patient would have to cooperate with the examining psychiatrist to establish whether or not he was sane or not sane at the time of the alleged commission of the acts. So that in that circumstance the court finds that the—there is a substantial state interest in the administration of medication to an accused when that accused has been determined to be incompetent, if that medication might restore him to competency so that he could stand trial.

"There is, in this case, indication that if the defendant were not brain damaged the likelihood is 75 to 78 percent which—certainty—is a degree of medical certainty that has been accepted by the Supreme Court of this state. And, that even if the defendant has some organic brain damage, the medication, most likely, would be of assistance in restoring him to competency. The medication would also probably make the patient more flexible with regard to his refusal to undergo E.E.G. and to undergo psychological testing to determine if, in fact, there is organic brain damage.

"The extent to which the forcible administration may threaten the defendant's health—the court has inquired about and it's been developed that there are side effects. That only in significantly severe circumstances would the side effects ever be considered life-threatening and the type of medication that might induce would not likely be used.

"Also, there is testimony that the medication would be administered by competent professionals associated with the hospital including doctors, and trained staff who would monitor the administration of the medication and would be competent to determine if there were any untoward effects beyond

illness, if either became necessary. Thereafter, on

the slight effects indicated for the primary initial medication that is going to be utilized.

"So, the extent—would be least likely if the defendant consented to it. There was testimony here that the defendant had indicated that with a court order he might voluntarily submit to taking oral medication. And, the need to administer the medication forcibly might be removed. That even if the medication were to be administered forcibly it would [be by] physical restraint, most likely holding down by trained staff or in extreme circumstances by physical—by restraints such as the defendant appears in this court today.

"The nature of these charges are such that the community's interest in fairly and accurately determining the defendant's guilt or innocence outweighs whatever limited intrusion into the defendant's constitutional rights might exist as a result of forcible administration of medication.

"And, although the court inquired and the state inquired as to whether there is any less intrusive means to obtain an adjudication of his guilt or innocence—that really hasn't been demonstrated here. To leave him alone, the testimony would be, would be that whatever he is suffering from would probably be exacerbated. And, he would never, under those circumstances, be—stand trial on this matter.

"The other alternative, of course, is that he is suffering from organic brain damage to the extent, as suggested by the defense, to the extent that he could never be restored to competency under the provisions of § 54-56d.

"But again, the testimony today is that can't be ascertained unless the defendant submits to the E.E.G. tests and to psychological testing, which he has not done as part of the psychosis which has also caused the specialist to determine that he is not competent at the present time.

"So that weighing those various factors, the court determines that, if necessary, the staff—medical staff, under appropriate supervision at Fairfield—at Whiting Forensic Institute, may administer psychotropic medication, which that staff determines would be of assistance in restoring the defendant to competency.

"If the order of this court alone does not secure the cooperation of the defendant, as indicated it might, that medication may be forcibly administered.

"The court is not in the position to give any further guidelines to the staff at Whiting Forensic Institute except that the medication be administered in the manner that is deemed medically appropriate in the quantity and under the circumstances that the staff deems, in light of its experience in this particular area, is appropriate for this particular individual. And, that any medication, other than the one initially indicated that might be of stronger potency be administered upon a conclusion only that that medication is necessary or desirable as an alternative medication and be administered to the extent and in the manner that is medically approved by the staff of Whiting Forensic Institute."

August 26, 1994, the defendant filed his appeal in the Appellate Court challenging the medication order.[11] On November 22, 1994, we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c), and on December 1, 1994, we granted the state's motion to expedite the appeal in order to attempt to resolve this issue before expiration of the eighteen month time limit on the defendant's detention at Whiting pursuant to § 54-56d (i) (1), which would occur on March 23, 1995.[12]

I

As a preliminary matter, we must determine whether we have jurisdiction to hear this interlocutory appeal. Although both parties agree that we have jurisdiction under the circumstances of this case, "[j]urisdiction of the subject matter is a question of law and cannot be waived or conferred by consent either in the trial court or here. *Serrani* v. *Board of Ethics*, 225 Conn. 305, 308, 622 A.2d 1009 (1993). [T]he court has a duty to dismiss, even on its own initiative, any appeal that it lacks jurisdiction to hear. *Sasso* v. *Aleshin*, 197 Conn. 87, 89, 495 A.2d 1066 (1985); *Tomlinson* v. *Board of Education*, 226 Conn. 704, 718, 629 A.2d 333 (1993)." (Internal quotation marks omitted.) *Simms* v. *Warden*, 229 Conn. 178, 180, 640 A.2d 601 (1994).

"It is axiomatic that, except insofar as the constitution bestows upon this court jurisdiction to hear certain cases; see *Fonfara* v. *Reapportionment Commission*,

[11] The defendant subsequently filed a motion to reopen the hearing, which was denied by the court. Although the defendant appeals from the denial of this motion to reopen, our determination of the defendant's other claims obviates the need for us to address whether the court abused its discretion in refusing to reopen the hearing.

[12] In light of the time necessary to resolve the complex and important issues in this case, following oral argument in this court on January 10, 1995, we issued, on January 19, 1995, a sua sponte order staying the running of the eighteen month period of maximum placement pending the further order of this court. See part V of this opinion.

222 Conn. 166, 610 A.2d 153 (1992); the subject matter jurisdiction of the Appellate Court and of this court is governed by statute. *Grieco* v. *Zoning Commission*, 226 Conn. 230, 231, 627 A.2d 432 (1993). It is equally axiomatic that, except insofar as the legislature has specifically provided for an interlocutory appeal or other form of interlocutory appellate review; see, e.g., General Statutes § 52-278*l* (prejudgment remedies); General Statutes § 54-63g (petition for review of bail); General Statutes § 51-164x (court closure orders); *State* v. *Ayala*, 222 Conn. 331, 340, 610 A.2d 1162 (1992); appellate jurisdiction is limited to final judgments of the trial court. General Statutes § 52-263;[13] *State* v. *Curcio*, [191 Conn. 27, 30, 463 A.2d 566 (1983)]." *Waterbury Teachers Assn.* v. *Freedom of Information Commission*, 230 Conn. 441, 447, 645 A.2d 978 (1994).

"In a criminal proceeding, there is no final judgment until the imposition of a sentence. *State* v. *Coleman*, 202 Conn. 86, 89, 519 A.2d 1201 (1987); *State* v. *Grotton*, 180 Conn. 290, 293, 429 A.2d 871 (1980). . . . The general rule is . . . that interlocutory orders in criminal cases are not immediately appealable. *United States* v. *MacDonald*, 435 U.S. 850, 857, 98 S. Ct. 1547, 56 L. Ed. 2d 18 (1978) (denial of motion for speedy trial); *Cogen* v. *United States*, 278 U.S. 221, 227–28, 49 S. Ct. 118, 73 L. Ed. 275 (1929) (denial of motion for return of seized property); *State* v. *Atkins*, 203 Conn. 33, 34, 522 A.2d 1234 (1987) (finding of probable cause to

---

[13] General Statutes § 52-263 provides: "APPEALS FROM SUPERIOR COURT. EXCEPTIONS. Upon the trial of all matters of fact in any cause or action in the superior court, whether to the court or jury, or before any judge thereof when the jurisdiction of any action or proceeding is vested in him, if either party is aggrieved by the decision of the court or judge upon any question or questions of law arising in the trial, including the denial of a motion to set aside a verdict, he may appeal to the court having jurisdiction from the final judgment of the court or of such judge, or from the decision of the court granting a motion to set aside a verdict, except in small claims cases, which shall not be appealable, and appeals as provided in sections 8-8 and 8-9."

believe criminal offense has been committed); *In re Juvenile Appeal (85-AB)*, 195 Conn. 303, 306, 488 A.2d 778 (1985) (denial of a motion to transfer to the criminal docket) [superseded by statute as stated in *In re Keijam T.*, 221 Conn. 109, 602 A.2d 967 (1992)];[14] *State v. Longo*, 192 Conn. 85, 89, 469 A.2d 1220 (1984) (denial of motion for youthful offender status); *State v. Spendolini*, 189 Conn. 92, 97, 454 A.2d 720 (1983) (denial of motion for accelerated rehabilitation); *State v. Grotton*, supra, 295–96 (granting of state's motion to take nontestimonial evidence from defendant); *State v. Kemp*, 124 Conn. 639, 646–47, 1 A.2d 761 (1938) (permitting defendant access to grand jury minutes); compare *State v. Aillon*, 182 Conn. 124, 126, 438 A.2d 30 (1980), cert. denied, 449 U.S. 1090, 101 S. Ct. 883, 66 L. Ed. 2d 817 (1981) (colorable double jeopardy claim immediately appealable)." *State v. Ayala*, supra, 222 Conn. 339.

" 'We have recognized, however, in both criminal and civil cases, that certain otherwise interlocutory orders may be final judgments for appeal purposes. . . . "An otherwise interlocutory order is appealable in two circumstances: (1) where the order or action terminates a separate and distinct proceeding, or (2) where the order or action so concludes the rights of the parties that further proceedings cannot affect them." *State v. Curcio*, supra, [191 Conn.] 31, citing *State v. Bell*, 179 Conn. 98, 99, 425 A.2d 574 (1979).' *State v. Southard*, [191 Conn. 506, 509–10, 467 A.2d 920 (1983)]. Unless the appeal is authorized under the *Curcio* criteria,

[14] We note that the language of General Statutes (Rev. to 1991) § 46b-127 relied upon in *In re Keijam T.*, supra, 221 Conn. 114–15 n.6, namely, that " '[a]n order by the court under this section transferring a child from the docket for juvenile matters to the regular criminal docket of the superior court shall be a final judgment for purposes of appeal,' " was removed from the statute by Public Acts, Special Session, July, 1994, No. 94-2, § 6. The effect of this statutory amendment is not before us in this case.

absence of a final judgment is a jurisdictional defect that results in a dismissal of the appeal. *Guerin* v. *Norton*, 167 Conn. 282, 283, 355 A.2d 255 (1974)." *State* v. *Paolella*, 210 Conn. 110, 119, 554 A.2d 702 (1989).

"The first alternative, termination of a separate and distinct proceeding, requires the order being appealed to be severable from the central cause to which it is related so that the main action can 'proceed independent of the ancillary proceeding.'" *In re Juvenile Appeal (85-AB)*, supra, 195 Conn. 307. In this case, the prosecution of the defendant could not go forward if we were to hold that the order allowing for forced medication of the defendant could properly be appealed. This medication order, therefore, is not a separate and distinct proceeding and fails to satisfy the first *Curcio* alternative.

We conclude, however, that this case falls within the narrow confines of the second prong of *Curcio*. We have held that "[i]n order to satisfy the second prong of the *Curcio* test the defendant must do more than show that the trial court's decision threatens him with irreparable harm. The defendant must show that that decision threatens to abrogate a right that he or she then holds." *State* v. *Longo*, supra, 192 Conn. 91. In *Longo*, we determined that the defendant could not bring an interlocutory appeal of the trial court's denial of the defendant's application for youthful offender status. Although we acknowledged that the defendant's privacy would be irreparably harmed by delaying the appeal and going forward with a trial, we concluded that the defendant did not have a right to be accorded youthful offender status, but merely had a right to apply for such status. The decision of whether to grant youthful offender status rests in the trial court's discretion, and "[t]hus, the rights that this defendant claims to be threatened by the trial court's decision are potential rights to which he is not yet entitled." Id., 92.

In contrast, in this case the defendant claims a liberty interest, protected by the due process clause of the constitution, to be free from being involuntarily medicated with antipsychotic medication. Like the defendant's privacy interest in *Longo*, once such an interest is infringed on by the state, the defendant's personal rights cannot be restored. The defendant's claimed right in this case, however, is not a contingent right created by statute and subject to the discretion of the trial court, but is, rather, a vested right of constitutional dimension. "For an interlocutory order to be an appealable final judgment it must threaten the preservation of a right that the defendant already holds. . . . [T]he dispositive issue is whether the defendant already enjoys a right that the order threatens irreparably." Id., 92–93. The claim in this case is that the defendant has the right to be free from involuntary medication, not at the discretion of the court, but subject only to limitations defined by due process. Accordingly, we conclude that this interlocutory appeal falls within the second prong of *Curcio*, and, therefore, we have jurisdiction over it.

## II

The defendant claims that his due process rights, under the United States and Connecticut[15] constitutions, were violated by: (1) the trial court's order to medicate him involuntarily in order to restore him to competency; and (2) the court's refusal to appoint

[15] The defendant has failed to cite to any case decided under our state constitution or to provide any independent analysis to indicate that the protections afforded by the state constitution provide greater rights to him than the federal constitution provides. "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue." *State* v. *Robinson,* 227 Conn. 711, 721, 631 A.2d 288 (1993); *Frillici* v. *Westport,* 231 Conn. 418, 437 n.24, 650 A.2d 557 (1994). We therefore limit our analysis to the defendant's rights under the federal constitution.

a health care guardian to represent his medical interests. In particular, he claims that both the federal constitution and state law create cognizable liberty interests in freedom from involuntary medication. He further claims that he can be deprived of his liberty interest only if the treatment is medically appropriate and the state has an overriding justification for medicating him. Accordingly, he argues, any order to medicate a criminal defendant involuntarily must reflect an appropriate balance between the state's interest, in this case the adjudication of the defendant's guilt or innocence, and the liberty and privacy interests of the defendant.

## A

"The conviction of an accused person who is not legally competent to stand trial violates the due process of law guaranteed by the state and federal constitutions. Conn. Const., art. I, § 8; U.S. Const., amend. XIV, § 1; see *Pate* v. *Robinson*, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966). . . . This constitutional mandate is codified in General Statutes § 54-56d (a), which provides that '[a] defendant shall not be tried, convicted or sentenced while he is not competent.' " *State* v. *Gonzalez*, 205 Conn. 673, 686–87, 535 A.2d 345 (1987). "Competence to stand trial, however, is not defined in terms of mental illness. An accused may be suffering from a mental illness and nonetheless be able to understand the charges against him and to assist in his own defense; *Lee* v. *Alabama*, 406 F.2d 466, 471–72 [(5th Cir. 1968), cert. denied, 395 U.S. 927, 89 S. Ct. 1787, 23 L. Ed. 2d 246 (1969)]; and the fact that [a] defendant was receiving medication and would require medication during the course of [a] trial does not render him incompetent. *State* v. *Hampton*, 253 La. 399, 403, 218 So. 2d 311 (1969); *People* v. *Hardesty*, 139 Mich. App. 124, 144–45, 362 N.W.2d

787 (1984)." *State* v. *DeAngelis*, 200 Conn. 224, 230, 511 A.2d 310 (1986).

The trial court found that the defendant was incompetent to stand trial. Pursuant to § 54-56d (i) (2),[16] the court remanded the defendant to the custody of the commissioner of mental health for treatment. The period of placement for restoration of competency under § 54-56d is limited to the maximum sentence that the defendant could receive on conviction of the charge against him or eighteen months, whichever is less. General Statutes § 54-56d (i) (1). At the expiration of this period, or at any earlier time that the court determines that there is not a substantial probability that the defendant will become competent within the period of treatment allowed by that section, the defendant must be either released or held pursuant to civil commitment procedures. General Statutes § 54-56d (m).[17] The questions of whether, and under what circumstances, a defendant can be restored to competency during the permissible placement period through the involuntary administration of antipsychotic medication have not been before us previously.

B

"[T]he whole subject of treating incompetence to stand trial by drug medication is somewhat new to the law, if not to medicine." *Riggins* v. *Nevada*, 504 U.S. 127, 138, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992) (Kennedy, J., concurring). Although the United States Supreme Court has not had occasion to develop procedural standards pertaining to forced medication in the pretrial stage, it has addressed a person's substantive liberty interest, under the fourteenth amendment to the United States constitution, in his freedom from

[16] See footnote 1.
[17] See footnote 1.

involuntary administration of antipsychotic medication under other circumstances. We are guided by these principles in determining the scope of the defendant's substantive liberty interest in the circumstances of this case.

In *Washington* v. *Harper*, 494 U.S. 210, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990), the United States Supreme Court considered a civil rights action, brought in state court pursuant to 42 U.S.C. § 1983, in which a Washington state prisoner challenged a prison policy that authorized his treatment with antipsychotic drugs against his will, subject only to an administrative hearing and without the opportunity for judicial review.[18]

---

[18] In the state of Washington, in accordance with Policy 600.30 (policy), if a psychiatrist determines that an inmate should be treated with antipsychotic drugs but the inmate does not consent, the inmate may be subjected to involuntary treatment with the drugs only if he (1) suffers from a "mental disorder," and (2) is "gravely disabled" or poses a "likelihood of serious harm" to himself, others or their property. *Washington* v. *Harper*, supra, 494 U.S. 215. If the inmate refuses to take the medication voluntarily, he is entitled to a hearing before a committee consisting of a psychiatrist, a psychologist and the associate superintendent of the special offender center, none of whom may be, at the time of the hearing, involved in the inmate's treatment or diagnosis. If a majority of the committee determines that the inmate suffers from a mental disorder and is gravely disabled or dangerous, the inmate may be medicated against his will, provided the psychiatrist is in the majority.

The policy's definitions of "mental disorder," "gravely disabled" and "likelihood of serious harm" are identical to the definitions of those terms as they are used in Washington's involuntary commitment statute. " 'Mental disorder' means 'any organic, mental, or emotional impairment which has substantial adverse effects on an individual's cognitive or volitional functions.' " Id., 215 n.3, quoting Wash. Rev. Code § 71.05.020 (2) (1987). " 'Gravely disabled' means 'a condition in which a person, as a result of a mental disorder: (a) [i]s in danger of serious physical harm resulting from a failure to provide for his essential human needs of health or safety, or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.' " Id., quoting Wash. Rev. Code § 71.05.020 (1) (1987). " 'Likelihood of serious harm' means 'either: (a) [a] substantial risk that physical harm will

The Washington Supreme Court had concluded that the "highly intrusive nature" of treatment with antipsychotic medications warranted a full judicial hearing in which the state must prove by "clear, cogent, and convincing" evidence that the administration of antipsychotic medication was both necessary and effective for furthering a compelling state interest. *Harper* v. *State*, 110 Wash. 2d 873, 880–84, 759 P.2d 358 (1988).

The United States Supreme Court reversed the Washington court's decision. Justice Kennedy, writing for the majority, agreed that an inmate's "interest in avoiding the unwarranted administration of antipsychotic drugs is not insubstantial. The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. . . . The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes. . . . While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects." (Citations omitted.) *Washington* v. *Harper*, supra, 494 U.S. 229. Moreover, the court noted that it had "no doubt that, in addition to the liberty interest created by the State's Policy, [an inmate] possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." Id., 221–22. The court concluded, however, that "the

be inflicted by an individual upon his own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on one's self, (b) a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm, or (c) a substantial risk that physical harm will be inflicted by an individual upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others.' " Id., quoting Wash. Rev. Code § 71.05.020 (3) (1987).

proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is 'reasonably related to legitimate penological interests.' " Id., 223. Utilizing this standard, the court determined that the review procedures contained in the prison's policy were constitutionally adequate.

The court further explored the contours of the liberty interest in avoiding the involuntary administration of antipsychotic drugs in *Riggins* v. *Nevada*, supra, 504 U.S. 127. Riggins had been arrested in connection with a murder in Nevada. Several days after being taken into custody, he told a psychiatrist at the jail that he had been hearing voices in his head and was having trouble sleeping. Riggins informed the psychiatrist that he had been successfully treated with the antipsychotic medication Mellaril in the past. After this consultation, the psychiatrist prescribed Mellaril, as well as Dilantin, an antiepileptic drug, for Riggins, and gradually increased the dosage of the drug when Riggins continued to complain of voices and problems sleeping. While voluntarily taking Mellaril, Riggins was found by the trial court to be legally sane and competent to stand trial. Id., 130.

Prior to the beginning of his trial, Riggins moved for an order suspending administration of Mellaril and Dilantin until the end of his trial, claiming that continued administration of these drugs infringed on his freedom and that the drugs' effect on his demeanor and mental state during trial would deny him due process under the fourteenth amendment.[19] Id. The state

[19] Riggins claimed that, because he would offer an insanity defense at trial, he had a right to show jurors his " 'true mental state.' " *Riggins* v. *Nevada*, supra, 504 U.S. 130. Although the Supreme Court reversed Riggins' conviction, it did so "[b]ecause the record contain[ed] no finding that might [have supported] a conclusion that administration of antipsychotic medication was necessary to accomplish an essential state policy," and,

argued that because Nevada law prohibits the trial of incompetent persons, the trial court had authority to compel Riggins to take medication necessary to ensure that he remained competent. Id. After holding an evidentiary hearing on Riggins' motion, in which evidence was presented on the possible medical effect of suspending the administration of Mellaril to Riggins, the court, in a one page order that gave no indication of its rationale, denied the motion to terminate medication. Id., 131. Riggins continued to receive Mellaril each day through the completion of the trial. A jury found Riggins guilty of murder with the use of a deadly weapon and robbery with use of a deadly weapon, and, after a penalty hearing, sentenced Riggins to death. Id.

Riggins claimed in the Nevada Supreme Court that the forced administration of Mellaril had denied him

---

therefore, there was "no basis for saying that the substantial probability of trial prejudice in this case was justified." Id., 138.

The defendant in this case has not claimed that antipsychotic medication would infringe on his right to show jurors his "true" mental state or otherwise prejudice him by adversely affecting his demeanor or appearance at trial. Although such effects of antipsychotic medication may require a trial court to consider whether the state's interests served by involuntarily medicating the defendant outweigh whatever prejudice is thereby caused to the defendant, in the absence of evidence in this case that the medication would lead to such effects, proper evaluation of such a claim can only be made in the context of all of the facts and circumstances existing at the time of trial. If and when such a claim is made, the trial court will be required to rule on that claim in the context of those facts and circumstances, which will include the actual effects of the medication on the defendant. Moreover, once rendered competent, a defendant, rather than objecting to the changes in his demeanor, may very well want to continue medication rather than return to his psychotic state.

In this connection, we note that the assertion of the concurrence that a defendant "has the right to present himself to the jury—in speech, appearance and personality—as he really is at the time of trial, and probably was at the time he allegedly committed the crime," presumably regardless of the necessity of medicating him to render him competent to stand trial in the first place, is a proposition that, as far as we can tell, no court has ever stated to be mandated by the federal due process clause. Certainly, *Riggins*, read carefully, does not stand for that proposition. Thus, whether a defendant has such a right is not an issue that is posed by, or properly decided, on this record.

the ability to assist in his own defense and prejudicially affected his attitude, appearance and demeanor at trial, and he further claimed that the state intruded on his constitutionally protected liberty interest in freedom from antipsychotic drugs without considering less intrusive options. The Nevada Supreme Court affirmed Riggins' conviction. Id., 132.

The United States Supreme Court reversed the conviction. The Supreme Court held that, "[u]nder *Harper*, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness. The Fourteenth Amendment affords at least as much protection to persons the State detains for trial. See *Bell* v. *Wolfish*, 441 U.S. 520, 545 [99 S. Ct. 1861, 60 L. Ed. 2d 447] (1979) ('[p]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners'); *O'Lone* v. *Estate of Shabazz*, 482 U.S. 342, 349 [107 S. Ct. 2400, 96 L. Ed. 2d 282] (1987) ('[p]rison regulations . . . are judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights'). Thus, once Riggins moved to terminate administration of antipsychotic medication, the State became obligated to establish the need for Mellaril and the medical appropriateness of the drug.

"Although [the United States Supreme Court has] not had occasion to develop substantive standards for judging forced administration of such drugs in the trial or pretrial settings, [the state] certainly would have satisfied due process if the prosecution had demonstrated and the [trial court] had found that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others. See [*Washington* v. *Harper,* supra, 494 U.S.

225–26]; cf. *Addington* v. *Texas*, 441 U.S. 418 [99 S. Ct. 1804, 60 L. Ed. 2d 323] (1979) (Due Process Clause allows civil commitment of individuals shown by clear and convincing evidence to be mentally ill and dangerous). Similarly, the State *might* have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means. See *Illinois* v. *Allen*, 397 U.S. 337, 347 [90 S. Ct. 1057, 25 L. Ed. 2d 353] (1970) (Brennan, J., concurring) ('[c]onstitutional power to bring an accused to trial is fundamental to a scheme of "ordered liberty" and prerequisite to social justice and peace')." (Emphasis added.) *Riggins* v. *Nevada*, supra, 504 U.S. 135–36.

It is unclear whether the Supreme Court, in using the word "might," intended to reserve the issue of whether the state can justify involuntary treatment to restore a defendant to competency for the sole purpose of bringing him to trial, or whether the court intended the word "might" to indicate that such treatment *is* justified, but only if certain conditions are met. In any event, we conclude that the state's interest in bringing the defendant to trial can constitute an overriding justification for the involuntary medication of the defendant under certain circumstances.

The state's ability to bring an accused criminal to trial is fundamental to our system of law because it is essential to the effectuation of the state's vital interest in the enforcement of its criminal laws. "The safeguards that the Constitution accords to criminal defendants presuppose that government has a sovereign prerogative to put on trial those accused in good faith of violating valid laws. Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace." *Illinois* v. *Allen*, supra, 397 U.S. 347 (Brennan, J., concurring).

In balancing the rights of the accused against state interests in enforcement of criminal laws, the United States Supreme Court has made reference to "the community's vital interests in law enforcement"; *Winston v. Lee,* 470 U.S. 753, 759, 105 S. Ct. 1161, 84 L. Ed. 2d 662 (1985); and has noted that "the community's interest in fairly and accurately determining guilt or innocence . . . is of course of great importance." Id., 76.

Other courts facing the issue now before us have similarly determined that the state's interest in enforcing its criminal laws by bringing a defendant to trial is significant and, under certain circumstances, can override the liberty and privacy interests of the defendant. In *Khiem v. United States,* 612 A.2d 160 (D.C. App. 1992), cert. denied, 507 U.S. 924, 113 S. Ct. 1293, 122 L. Ed. 2d 684 (1993), the District of Columbia Court of Appeals rejected a claim that the state's interests in involuntarily medicating a defendant for the purpose of rendering him competent to stand trial were "largely symbolic." As under our statutory scheme, the incompetent defendant could be held only for a limited time before the government was required either to release him or begin civil commitment proceedings. Because civil commitment required the government to prove that the defendant presents a present danger to himself or others, and, as in this case, there had been no such allegation,[20] the government would be forced to

---

[20] Presumably, if the defendant was a present danger to himself or others, the state would make such a claim in its motion to medicate the defendant, because proof that the defendant is a danger to himself or others is sufficient to allow the state to pursue medically appropriate involuntary treatment of the defendant to alleviate that danger without consideration as to whether such medication is necessary to bring the defendant to trial. See footnote 27; see also General Statutes § 17a-543 (f) (allowing involuntary medication of civil committees upon implementation of procedures for notice and appeal, proof that medication is least intrusive method of treatment and proof that without medication, mental illness will continue

release the defendant if it could not restore him to competency to stand trial. Even if the defendant could be civilly committed he would have to be released as soon as he no longer presented a risk to himself or others, which might be many years before he would have been eligible for release if he had been tried and convicted. "Accordingly, if all of the declarations on [the defendant's] behalf were taken at face value, and if his legal contentions were to prevail, he might soon be a free man without his guilt or innocence of [committing murder] having first been established, and this could continue indefinitely unless he regained his competency to stand trial.[21] Unless we view the trial of homicide cases, the deterrence and punishment of crime, and the incapacitation of criminals as insignificant, the government's law enforcement interest in determining whether [the defendant committed the crime he is accused of] is far more than merely symbolic." Id., 167. We agree with the conclusion of the District of Columbia Court of Appeals that the state's interest in bringing a defendant to trial can be an "overriding justification" for involuntary medication under *Riggins*. Accord *Woodland* v. *Angus*, 820 F. Sup. 1497, 1511 (D. Utah 1993).

C

The defendant claims that state law provides him with a greater protected liberty interest than that arising under the due process clause of the fourteenth amendment itself, as enumerated in *Harper* and *Rig-*

---

unabated and will place patient or others in direct threat of harm). In this case, the defendant asserts that he has not been found dangerous to himself or others and the state acknowledges that it does not seek to medicate him on the basis of dangerousness.

[21] Moreover, even if the defendant were deemed competent to stand trial upon his eventual release from civil commitment, it might at that time be impossible to try him, because, in the interim, evidence could have become stale and witnesses could have become unavailable.

*gins.* Specifically, the defendant argues that the patients' bill of rights; see General Statutes § 17a-540 et seq.; and our case law "arguably [define] the personal interest to refuse antipsychotic medication more expansively than simply 'a significant liberty interest.' " Although we agree that state statutes and case law do create a cognizable interest in avoiding unwanted medication, we are not persuaded that this interest is any broader than that already arising as a matter of federal substantive due process.

"Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the states. *Meachum* v. *Fano*, 427 U.S. 215 [223–27, 96 S. Ct. 2532, 49 L. Ed. 2d 451] (1976)." *Hewitt* v. *Helms*, 459 U.S. 460, 466, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983). In other words, once a state provides its citizens with certain statutory rights beyond those secured by the constitution itself, the constitution forbids the state from depriving individuals of those statutory rights without due process of law.

The defendant claims that the patients' bill of rights provides him with statutory rights beyond those secured solely as a matter of substantive due process. The patients' bill of rights "was intended to remedy the then prevailing conditions at state mental health facilities . . . '[under which] mental hospital patients [were] regularly exposed to various institutional policies and practices which deprive[d] them of their basic human rights and which [had] a demoralizing and dehumanizing effect on the individual . . . .' " *Mahoney* v. *Lensink*, 213 Conn. 548, 559–60, 569 A.2d 518 (1990). General Statutes § 17a-543 (a),[22] which is

---

[22] General Statutes § 17a-543 provides in relevant part: "PROCEDURES GOVERNING MEDICATION, TREATMENT, PSYCHOSURGERY AND SHOCK THERAPY. (a) No patient shall receive medication for the treatment of the mental illness of such patient without the informed consent of such patient,

part of the patients' bill of rights, and which governs medication and treatment and requires informed consent of the patient or his conservator of the person, provides that "[n]o patient shall receive medication for the treatment of the mental illness of such patient without the informed consent of such patient, except in accordance with [the procedures enumerated in this section] *or in accordance with section 17a-566 or 54-56d.*" (Emphasis added.) It is clear, therefore, that § 17a-543 does not pertain to patients in the custody of the commissioner of mental health pursuant to § 54-56d. Whatever rights the enumerated procedures provide for patients subject to treatment pursuant to civil commitment, therefore, are not applicable to § 54-56d committees, whose rights with respect to treatment instead are governed by the procedures set forth in that section.[23]

There is not, however, any such exclusion of § 54-56d committees from the other provisions of the patients' bill of rights. Nonetheless, we are convinced that these other provisions would not necessarily be violated by involuntary medication of the defendant. The mandate of General Statutes § 17a-542[24] that the defendant

---

except in accordance with procedures set forth in subsections (b), (d), (e) and (f) of this section or in accordance with section 17a-566 or 54-56d."

[23] The defendant claims that the exclusion of § 54-56d detainees from the procedures enumerated under § 17a-543 violates his right to equal protection under the state constitution. Although the defendant is correct that strict scrutiny must be applied where a statutory classification impacts upon an inherently suspect group, we are unpersuaded that criminally accused committees are an inherently suspect group within the pool of all committees. Furthermore, § 54-56d provides for judicially supervised treatment, which provides at least as much protection, if not more protection, for the defendant's rights as the administrative procedure enumerated in § 17a-543.

[24] General Statutes § 17a-542 provides: "HUMANE AND DIGNIFIED TREATMENT REQUIRED. FORMULATION OF DISCHARGE PLAN. Every patient treated in any facility for treatment of persons with a mental illness shall receive humane and dignified treatment at all times, with full respect for his personal dignity and right to privacy. Each patient shall be treated in accordance with a specialized treatment plan suited to his disorder. Such treatment

"receive humane and dignified treatment at all times, with full respect for his personal dignity and right to privacy [and that he] be treated in accordance with a specialized treatment plan suited to his disorder," can, and must, be complied with even where such treatment is involuntary. Moreover, the requirement for a specialized treatment plan under § 17a-542 appears to us to be coextensive with the requirement that the treatment of the defendant be medically appropriate in order to comply with the due process clause.[25] *Riggins* v. *Nevada*, supra, 504 U.S. 136.

The defendant also claims that our precedents provide him with a greater liberty interest than that defined under the due process clause. Specifically, the defendant relies on *McConnell* v. *Beverly Enterprises-Connecticut, Inc.*, 209 Conn. 692, 553 A.2d 596 (1989), claiming that we recognized "the fundamental right to refuse medical treatment, and the common law right of any individual to the possession and control of his/her own body." That case, however, involved the right to refuse medical treatment by a terminal patient and was decided on statutory grounds. Although we acknowledged the common law right to control over one's body, we neither explored the contours of that right nor did we state that it was absolute in the face of countervailing governmental interests. We are unconvinced that *McConnell* provides a basis for the defendant's claim that state common law has provided him with a

plan shall include a discharge plan which shall include, but not be limited to, (1) reasonable notice to the patient of his impending discharge, (2) active participation by the patient in planning for his discharge and (3) planning for appropriate aftercare to the patient upon his discharge."

[25] We note that the "statutory responsibility [mandated by § 17a-542] for the formulation and subsequent monitoring of an appropriate treatment plan for each patient does not, however, encompass a guarantee that the treatment plan will invariably produce the desired results. A poor outcome may occur despite the best possible medical practice." *Mahoney* v. *Lensink*, supra, 213 Conn. 565–66.

liberty interest broader or more absolute than arises as a matter of substantive due process under the federal constitution, in freedom from involuntary treatment to restore him to competency.[26]

Thus, we conclude that the defendant has a liberty interest, protected by the due process clause of the fourteenth amendment, in freedom from the unwanted administration of antipsychotic drugs. The state may not infringe on this liberty interest unless: (1) the administration of the drugs is "medically appropriate"; and (2) the state demonstrates an overriding justification for doing so. As discussed previously, such an overriding justification includes the state's inability to obtain an adjudication of the defendant's guilt or innocence by using less intrusive means.[27]

### III

Our identification of the defendant's substantive liberty interest is not the end of our inquiry. "[I]dentifying the contours of the substantive right remains a task distinct from deciding what procedural protections are necessary to protect that right. . . . [T]he substantive issue involves a definition of th[e] protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it. The procedural issue concerns the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance." (Internal quota-

---

[26] We do not consider whether the state constitution may afford the defendant greater rights than the federal constitution. See footnote 15.

[27] The United States Supreme Court has clearly stated that a defendant also may be involuntarily medicated if he presents a danger to himself or to others. *Riggins* v. *Nevada,* supra, 504 U.S. 135. ("Nevada certainly would have satisfied due process if the prosecution had demonstrated, and the District Court had found, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others").

tion marks omitted.) *Washington* v. *Harper*, supra, 494 U.S. 220. Although we have identified that the defendant has a liberty interest in his freedom from unwanted medication with antipsychotic drugs that may be overcome if the proposed treatment is medically appropriate and the adjudication of his guilt or innocence cannot be obtained by less intrusive means, in order properly to balance the defendant's and the state's interests we must determine what procedures a trial court must follow in deciding whether to order involuntary medication of an incompetent defendant.

In *Riggins* v. *Nevada,* supra, 504 U.S. 136, the United States Supreme Court declined to prescribe a particular standard because, in that case, the trial court had ordered the continued medication of the defendant "without making *any* determination of the need for this course or *any* findings about reasonable alternatives." (Emphasis in original.) In the case before us, on the other hand, the trial court was presented with the available precedent and heard expert testimony on the propriety of involuntary medication in the defendant's case. Although the trial court was aware that the defendant had an interest in his freedom from involuntary medication, it had little guidance as to the contours of that right and what process was required to protect that right.

Moreover, we have found few cases that have addressed the procedural safeguards necessary to protect the liberty interest identified in *Washington* v. *Harper,* supra, 494 U.S. 210, and *Riggins* v. *Nevada,* supra, 504 U.S. 127, under the circumstances of this case. In *State* v. *Odiaga,* 125 Idaho 384, 871 P.2d 801, cert. denied,    U.S.    , 115 S. Ct. 369, 130 L. Ed. 2d 321 (1994), the Idaho Supreme Court reversed the conviction of the defendant because the trial court had not properly balanced the interests of the defendant with those of the state when the defendant moved to

terminate the administration of antipsychotic medication. In that case, the court concluded that "[t]he burden rests with the prosecution to show that medication is medically appropriate, essential to protect some significant interest, such as [the defendant's] safety or the safety of others, and that no less [intrusive] means of protecting that interest exists." Id., 387; cf. *Khiem* v. *United States*, supra, 612 A.2d 165–66 (government must make showing of overriding justification and medical appropriateness, but once such showing has been made, due process only protects defendant from unreasonable or arbitrary determination that involuntary medication is appropriate).

We agree with the conclusion of the Idaho Supreme Court that *Riggins* requires that the prosecution meet this burden. We believe, however, that the state must prove additional elements that assist in the measurement and weighing of the defendant's privacy interests at stake.

In *Woodland* v. *Angus*, supra, 820 F. Sup. 1497, the United States District Court for the District of Utah imposed an even higher burden on the state. The plaintiff, Woodland, had been charged in Utah state court with murder. After finding Woodland incompetent to stand trial, the state court ordered the Utah state hospital to develop policies and procedures for the involuntary medication of patients consistent with the substantive and procedural due process requirements set forth in *Washington* v. *Harper*, supra, 494 U.S. 210. *Woodland* v. *Angus*, supra, 820 F. Sup. 1500. In accordance with this order, the state hospital established an administrative procedure, and pursuant to this procedure, Woodland was treated with antipsychotic medication against his will. Id., 1501. Woodland brought a civil rights action in the federal district court seeking an injunction prohibiting the state from continuing to medicate him forcibly, claiming that the policy estab-

lished by the state hospital violated the first and fourteenth amendments to the United States constitution. Id.

The District Court held that the policy violated Woodland's right to substantive due process guaranteed by the fourteenth amendment. After analyzing Woodland's liberty interest and the state interests that would be furthered by forcibly medicating Woodland, the court turned to the procedures required for an adequate balance of those interests. In reviewing the United States Supreme Court's decision in *Riggins* v. *Nevada,* supra, 504 U.S. 127, the District Court reached conclusions similar to those reached by the Idaho Supreme Court in *Odiaga.* "In determining whether this 'important' state interest [in adjudicating the plaintiff's guilt or innocence outweighs his] interest, the Supreme Court has delineated several factors which the court must consider. First, the court must consider whether to a reasonable degree of medical certainty the treatment would render the plaintiff competent. . . . Second, in the context of an involuntary medication case, the *Riggins* court stated that 'the State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means.' [*Riggins* v. *Nevada,* supra, 504 U.S. 135]. Therefore, the court must consider whether the defendants have shown the State of Utah cannot obtain an adjudication of [the] plaintiff's guilt or innocence using other means." (Citations omitted.) *Woodland* v. *Angus,* supra, 820 F. Sup. 1511.

The District Court went beyond these conclusions, however, and identified the privacy interests of the plaintiff that were also at issue in the state's involuntary medication of him. "The [Supreme] Court pronounced other factors that are applicable to this case

in *Winston* v. *Lee,* [supra, 470 U.S. 753]. In that case the Court held that a compelled surgical intrusion into a defendant's body for evidence implicates expectations of privacy and security of such magnitude that the intrusion may be 'unreasonable' even if likely to produce evidence of a crime. Id., 759, 767. In reaching this conclusion the Court considered: (1) the extent to which the procedure may threaten the individual's safety or health; (2) the extent of intrusion on the individual's dignitary interest in personal privacy and bodily integrity; and (3) the community's interest in fairly and accurately determining guilt or innocence. Id., 758–63." *Woodland* v. *Angus,* 820 F. Sup. 1511.[28]

We are persuaded that the *Woodland* court's analysis accurately identified the due process requirements necessary to protect the interests of a defendant faced with the prospect of involuntary medication. We agree that involuntary medication with antipsychotic medication raises not only the specific liberty interest identified in *Riggins* v. *Nevada,* supra, 504 U.S. 127, but the more general privacy interest of the defendant identified by the Supreme Court in *Winston* v. *Lee,* supra, 470 U.S. 753.

In order for a court to authorize the involuntary medication of an incompetent defendant to render him competent to stand trial, therefore, the state must demonstrate that: (1) to a reasonable degree of medical certainty, involuntary medication of the defendant

---

[28] While we recognize that *Winston* v. *Lee,* supra, 470 U.S. 753, was decided on fourth amendment grounds, we agree with the court in *Woodland* v. *Angus,* supra, 820 F. Sup. 1511, that these constitutional principles of privacy are persuasive and should be considered as part of the balancing of the interests of the defendant and the state. Furthermore, it is difficult to separate these privacy interests from the defendant's liberty interest in freedom from involuntary medication and, therefore, any balancing test should adequately protect that interest.

will render him competent to stand trial;[29] (2) an adjudication of guilt or innocence cannot be had using less intrusive means; (3) the proposed treatment plan is narrowly tailored to minimize intrusion on the defendant's liberty and privacy interest;[30] (4) the proposed drug regimen will not cause an unreasonable risk to the defendant's health;[31] and (5) the seriousness of the

[29] The concern expressed in the concurring opinion that we do not require proof that the treatment will not prejudice the defendant by rendering "him unable or unwilling to assist in his own defense" is misplaced. By requiring the state to prove to a reasonable degree of medical certainty that the treatment will render the defendant competent to stand trial, we require the state to prove the elements thereof, namely, that the defendant will be able "to understand the proceedings against him [and] *to assist in his own defense.*" (Emphasis added.) General Statutes § 54-56d (a). It should be obvious that that is what we mean by saying that the entire purpose of involuntary medication authorized under the conditions we outline herein is *"to render [the defendant] competent to stand trial."* (Emphasis added.)

[30] This requirement meets the mandate of the patients' bill of rights that "[e]very patient treated in any facility for treatment of persons with a mental illness shall receive humane and dignified treatment at all times, with full respect for this personal dignity and right to privacy. . . ." General Statutes § 17a-542.

[31] We are compelled to respond to the perplexing assertion in the concurring opinion that we seem "to delimit the defendant's privacy interest merely to that of whether 'the proposed drug regimen will not cause an unreasonable risk to the defendant's health.'" Although we find such an interpretation of the balancing test articulated herein to be difficult to comprehend, we take this opportunity to make even clearer that such an interpretation is misguided. It is plain from this opinion, and from the five prongs of the balancing test, that there must be a sound medical basis for the treatment of the defendant. We have already stated herein that the mandate of § 17a-542 "must be complied with," and that such a mandate is "coextensive with the requirement that *the treatment of the defendant be medically appropriate* in order to comply with the due process clause." (Emphasis added.) See part II of this opinion. Furthermore, not only must the state prove by clear and convincing evidence that, to a reasonable degree of medical certainty, involuntary medication *will* restore the defendant to competency, but it must also prove that the drug regimen will not cause an unreasonable risk to the defendant's health. Furthermore, the state must prove that involuntary medication is the least intrusive means to render the defendant competent and that the specific treatment plan is tailored to minimize intrusion of the defendant's considerable liberty and privacy interests. Furthermore, even if the state proves all these factors its task

alleged crime is such that the state's criminal law enforcement interest in fairly and accurately determining the defendant's guilt or innocence overrides the defendant's interest in self-determination.[32] The state, moreover, must demonstrate each of these factors by clear and convincing evidence.

"The function of the burden of proof employed by the court is to allocat[e] the risk of error between the litigants and indicat[e] the relative importance of the ultimate decision. *Addington* v. *Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 1808, 60 L. Ed. 2d 323 (1979). . . . *Cookson* v. *Cookson*, 201 Conn. 229, 234, 514 A.2d 323 (1986). . . . Proof by clear and convincing evidence is an intermediate standard generally used in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing, *or when particularly important individual rights are involved.* . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Davis*, 229 Conn. 285, 293–94, 641 A.2d 370 (1994).

In *State* v. *Metz*, 230 Conn. 400, 645 A.2d 965 (1994), we held that a defendant found not guilty of criminal charges by reason of mental disease or defect and

---

is not complete. The state must further prove that the seriousness of the alleged crime is such that its interests in bringing the defendant to trial are of a great enough magnitude to warrant such a compromise of the defendant's interests. Moreover, the assertion of the concurrence notwithstanding, the balancing test that the trial court must perform requires it to consider such factors as the nature of the defendant's mental illness, the probability of successful treatment, the risk of harm to the defendant and the potential side effects of the medication.

[32] Although " '[c]onstitutional power to bring an accused to trial is fundamental to a scheme of "ordered liberty" and prerequisite to social justice and peace' "; *Riggins* v. *Nevada*, supra, 504 U.S. 136, quoting *Illinois* v. *Allen*, supra, 397 U.S. 347 (Brennan, J., concurring); the state's interest in such adjudication increases with the seriousness of the crime alleged, and, conversely, decreases when the crime alleged is minor. Because all incompetent defendants have equally significant interests, recognition that the weight of the state's interest will necessarily vary is appropriate to ensure a proper balancing of interests in each case.

remanded to the custody of the commissioner of mental health was entitled to the same procedural protections, when the state petitioned for an extension of his term of commitment, as any other individual facing civil commitment proceedings. Accordingly, because the government must demonstrate by clear and convincing evidence that an individual is mentally ill and dangerous in order to prevail in civil commitment proceedings, we concluded that the government must bear the same burden of proof when it seeks to retain custody of an acquittee beyond his current period of commitment. "Although these procedural protections are directed to persons who are civilly committed, they apply as well, under federal equal protection law, to a state's initiation of involuntary commitment proceedings for certain persons involved in the criminal justice system, such as . . . criminal defendants found not competent to stand trial. *Jackson* v. *Indiana*, 406 U.S. 715, 724, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972)." Id., 413. Because our provisions for civil commitment; see General Statutes § 17a-498 (c);[33] and for conser-

---

[33] General Statutes § 17a-498 (c) provides: "The court shall require the sworn certificates of at least two impartial physicians selected by the court, one of whom shall be a practicing psychiatrist, both of whom shall be licensed to practice medicine in the state of Connecticut and to have been practitioners of medicine at least one year and not connected with the hospital for mental illness to which the application is being made, nor related by blood or marriage to the applicant, nor to the respondent. Such certificates shall indicate that they have personally examined such person within ten days of such hearing. The court shall appoint such physicians from a panel of physicians and psychiatrists provided by the commissioner of mental health and such appointments shall be made in accordance with regulations to be promulgated by the probate court administrator in accordance with section 45a-77. Each such physician shall make his report on a separate form provided for that purpose by the department of mental health and shall answer such questions as may be set forth on such form as fully and completely as reasonably possible. Such form shall include, but not be limited to questions relating to the specific mental illness alleged, whether or not the respondent is dangerous to himself or herself or others, whether or not such illness has resulted or will result in serious disruption of the respondent's mental and behavioral functioning, whether or not hospital treat-

vatorship proceedings, which govern the appointment of a conservator of the person for an individual incapable of caring for himself or herself; see General Statutes § 45a-650 (c);[34] require proof by clear and convincing evidence, we are convinced that the state ought to shoulder this burden of proof when it seeks to medicate a defendant involuntarily in order to ren-

ment is both necessary and available, whether or not less restrictive placement is recommended and available and whether or not respondent is incapable of understanding the need to accept the recommended treatment on a voluntary basis. Any such physician shall state upon the form the reasons for his or her opinions. Such respondent or his or her counsel shall have the right to present evidence and cross-examine witnesses who testify at any hearing on the application. If such respondent notifies the court not less than three days before the hearing that he or she wishes to cross-examine the examining physicians, the court shall order such physicians to appear. The court shall cause a recording of the testimony of such hearing to be made, to be transcribed only in the event of an appeal from the decree rendered hereunder. A copy of such transcript shall be furnished without charge to any appellant whom the court of probate finds unable to pay for the same. The cost of such transcript shall be paid from funds appropriated to the judicial department. If, on such hearing, the court finds by clear and convincing evidence that the person complained of is mentally ill and dangerous to himself or herself or others or gravely disabled, it shall make an order for his or her commitment, considering whether or not a less restrictive placement is available, to a hospital for mental illness to be named in such order, there to be confined for the period of the duration of such mental illness or until he or she is discharged or converted to voluntary status pursuant to section 17a-506 in due course of law. Such court order shall further command some suitable person to convey such person to such hospital for mental illness and deliver him or her, with a copy of such order and of such certificates, to the keeper thereof. In appointing a person to execute such order, the court shall give preference to a near relative or friend of the mentally ill person, so far as it deems it practicable and judicious. Notice of any action taken by the court shall be given to the respondent and his or her attorney, if any, in such manner as the court concludes would be appropriate under the circumstances."

[34] General Statutes § 45a-650 provides in relevant part: "HEARING. APPOINTMENT OF CONSERVATOR. . . .

"(c) If the court finds by clear and convincing evidence that the respondent is incapable of managing his or her affairs then the court shall appoint a conservator of his or her estate. If the court finds by clear and convincing evidence that the respondent is incapable of caring for himself or herself, then the court shall appoint a conservator of his or her person."

der him competent to stand trial.[35] See *Donaldson* v. *District Court*, 847 P.2d 632 (Colo. 1993) (recognizing that petitioning party must establish factors allowing for forced medication by clear and convincing evidence).

## IV

The defendant also claims that a guardian or special public defender should have been appointed by the trial court to represent his medical interests. We agree that a defendant's medical interests may diverge from his legal interests and, therefore, that representation by counsel may be insufficient to protect adequately an incompetent defendant's medical interests. We also agree that, in most circumstances, a defendant who is incompetent to stand trial also will be incompetent to make his own health care decisions and, therefore, will be unable to assist his legal counsel to advocate for his best medical interests. Accordingly, barring the unusual circumstance in which a trial court finds that a defendant, although incompetent to stand trial, is competent to make his own health care decisions, the trial court should appoint a health care guardian to represent the defendant's health care interests to the court.[36] On

[35] Although the Supreme Court did not explicitly adopt a standard of proof for hearings concerning the involuntary medication of a criminal defendant in *Riggins* v. *Nevada*, supra, 504 U.S. 135–36, it did cite to *Addington* v. *Texas*, supra, 441 U.S. 418, for the proposition that the due process clause allows for the civil commitment of individuals shown by clear and convincing evidence to be mentally ill and dangerous. In light of the significant liberty interest at stake in a hearing on forced medication, due process requires no lighter burden on the state in this context.

[36] Because we are not confident that the appointment of a health care guardian is required by applicable due process principles, but because we are nonetheless convinced of the wisdom of such an appointment in an appropriate case, we reach this determination on the basis of our supervisory powers over matters of criminal justice, rather than under the federal due process clause. We note, however, that our conclusion is supported by constitutional considerations as to how to give proper deference to the medical decisions of a person not competent to make such decisions on his own; see *Woodland* v. *Angus*, supra, 820 F. Sup. 1515–18; and by state law provid-

remand in this case, the trial court should determine whether appointment of a health care guardian is appropriate.

In some circumstances, the legal interests and the medical interests of a defendant may diverge. For example, it may be in the legal interest of a defendant not to stand trial and, therefore, it would be to his legal benefit to remain incompetent. Such a position, however, if sustained by the court, might result in the defendant being discharged after eighteen months, but in a continued and continuous psychotic state. Thus, although his legal interests would have been vindicated, arguably his medical interest in living a nonpsychotic life would have been overridden.

At the same time, however, a defendant may be treatable with medication that would render him competent with minimal or no side effects.[37] In such a case, for

---

ing for the medical treatment of individuals not competent to make medical decisions. See General Statutes §§ 45a-644 to 45a-663 and 17a-543 (requiring consent of conservator of person).

Although an attorney not otherwise interested in the case may be appointed as a defendant's health care guardian, neither a special public defender nor an attorney from the amicus Connecticut Legal Rights Project, Inc., generally will be the most appropriate person to act as the defendant's health care guardian. Typically, public defenders see their role as advocating for their client's *legal* interests such as the interest in avoiding trial. Similarly, the mission statement of the Connecticut Legal Rights Project, Inc., directs it to " 'represent clients in accordance with their *expressed* preferences' "; (emphasis added); a role that will not help the court to assess the defendant's actual best interests because the defendant is presumably incompetent to make his or her own health care decisions. We view the health care guardian as charged with ascertaining and informing the court not of the legal interests or solely the defendant's expressed medical preferences, but of the *actual best medical interests* of the defendant. The health care guardian would also, of course, be empowered to present evidence to the court, and to participate fully in the proceedings.

[37] We make this statement by way of example and do not imply that such a course of treatment is, or is not, actually available in this case. Such a determination must be independently reached in each case by consideration of the best medical information then available.

example, it may be that the medical treatment may alleviate his underlying psychosis and render him a fully cognitive person. In such a case, it may be to his medical benefit to receive such treatment.[38]

We conclude, therefore, that a defendant's medical interests may not be adequately represented by his criminal defense attorney. Given the invasive nature of treatment with antipsychotic medication, we consider it essential that the medical interests of a defendant be represented in proceedings to determine whether such medication will be involuntarily administered. Accordingly, when a defendant is not competent to make medical decisions, a health care guardian should be appointed to represent the defendant's best medical interests when the state seeks to administer medication over the defendant's objections. In rendering its decision, the trial court must take into account the guardian's opinion about the medical interests of the defendant, although the court must also consider the defendant's own legal objection to medication.

V

Finally, we must address an issue not raised by the parties, but that is necessary to be considered in light of our conclusion that this court has jurisdiction over an interlocutory appeal from an involuntary medication order. We must determine the effect of an appeal by the defendant from an involuntary medication order on the running of the time limit imposed on involuntary commitment for restoration of competency pursuant to § 54-56d.

Section 54-56d (i) (1) provides that the period of placement to restore competency shall not exceed the max-

---

[38] We emphasize that this description of the possible divergence between a defendant's legal and medical interests is just by way of example, and is not meant to cover the field of potential situations when a defendant's medical interests may diverge from his legal interests.

imum sentence that the defendant could have received on conviction of the charges against him or eighteen months, whichever is shorter. Under the circumstances of this case, by the terms of the statute, the defendant can remain committed to Whiting only for a maximum of eighteen months from the time he was found to be incompetent. Section 54-56d provides no guidance as to the effect on this period created by an appeal by the defendant challenging the trial court's medication order.

Were the period of maximum commitment to continue to run during the pendency of such an appeal, the ordinary time demands for such an appeal might well result in the release of, or commencement of civil commitment proceedings against, a defendant before the resolution of his appeal. The practical effect of an appeal from a medication order, therefore, could be effectively to escape the order's mandate. Thus, it is impractical and unduly prejudicial and burdensome to the state to allow the commitment time limit to run while the defendant's appeal is pending. In permitting a defendant to protect his rights through an interlocutory appeal, we cannot permit the defendant automatically to escape that which he asks us to undo. Rather, if the defendant sets in motion a process that will consume the available time for this treatment under the statute, it is equitable that the time period for treatment be stayed during the pendency of those proceedings.

We conclude, therefore, that the time limit for commitment for the restoration of competency enumerated in § 54-56d is stayed upon the filing of an interlocutory appeal by the defendant. If the appeal is determined in this court, the running of the period shall recommence at the expiration of the ten day window for motions to reargue in this court. See Practice Book § 4121. If the case is determined in the Appellate Court,

the running of the period shall recommence upon expiration of the twenty day window for filing a petition for certification to appeal to this court; see Practice Book § 4129; or upon denial of certification to appeal to this court, whichever is later. If a party petitions for certiorari to the United States Supreme Court following a decision on the merits or denial of certification by this court, the running of the period shall recommence upon denial of certiorari or resolution of any appeal granted thereby.

As pertains to this case, therefore, we conclude that the running of the eighteen month period was stayed on August 26, 1994, when the defendant appealed to the Appellate Court. It shall recommence on the eleventh day after this decision, unless a petition for certiorari to the United States Supreme Court is timely filed. Thus, barring further appeal, upon our remand, the period between August 24, 1994, and the eleventh day after this decision, must be subtracted from the calculation of the eighteen month period under § 54-56d.

## VI

Although the trial court made an admirable attempt, in the absence of guidance on this complex issue, to balance the interests of the defendant and the state before issuing the medication order, the court did not require the state to prove all the factors we enumerate above by clear and convincing evidence. Furthermore, the court did not specifically decide whether it was necessary to appoint a health care guardian, particularly as we have defined that role herein, to represent the defendant's medical interests in those proceedings. Accordingly, we must vacate the medication order and remand the case to the trial court for new proceedings on the issue of involuntary medication, in which a health care guardian may be appointed for the defendant and the state will be required to demonstrate, by clear and

convincing evidence, that: (1) to a reasonable degree of medical certainty, involuntary medication of the defendant will render him competent to stand trial; (2) an adjudication of guilt or innocence cannot be had using less intrusive means; (3) the proposed treatment plan is narrowly tailored to minimize intrusion on the patient's liberty and privacy interest; (4) the proposed drug regimen will not cause an unreasonable risk to the defendant's health; and (5) the seriousness of the alleged crime is such that the state's criminal law enforcement interest in fairly and accurately determining the defendant's guilt or innocence overrides the defendant's interest in self-determination.

The order of the trial court allowing for the involuntary medication of the defendant is vacated and the case is remanded for further proceedings in accordance with the previous paragraph, and for further proceedings according to law.

In this opinion PETERS, C. J., and KATZ and PALMER, Js., concurred.

BERDON, J., concurring. Although I agree with much of the majority's analysis,[1] I am concerned that the opinion does not place sufficient emphasis on additional factors that are implicated by any decision to medicate a criminal defendant with mind altering drugs against his will.[2] The limited factors identified in the majority

[1] I agree with the majority, for example, that a trial court, in deciding whether to medicate a criminal defendant against his will, must take into account the factors enumerated in the majority opinion, and that the state must prove each of these factors by clear and convincing evidence. See part III of the majority opinion; *State* v. *Metz*, 230 Conn. 400, 413, 645 A.2d 965 (1994).

[2] I do not join that part of the majority opinion that discusses the appointment of a health care guardian for the accused. Although I agree that the appointment of such a guardian may be prudent and beneficial in many circumstances, I do not believe that a guardian should be limited to the sterile task of protecting only the defendant's "health care interests" or

opinion satisfy the interests of the state in bringing the defendant to trial, but do not adequately take into account substantial privacy and due process rights of the accused. Specifically, I believe that the majority

his "best medical interests." Rather, I believe a guardian must take into account wider concerns, such as the individual's religious convictions or deeply held beliefs about personal privacy, as well as any ramifications of the forced administration of mind altering drugs that are not related to health.

The trial court undoubtedly will give significant weight to the opinion of such a guardian, because the guardian will be viewed as the surrogate for the defendant. If the guardian is forced to limit his or her opinion only to the medical consequences of antipsychotic drugs, rather than to the cumulative effects on a whole person of being forcibly medicated, the administration of antipsychotic drugs will become the rule in all situations in which there is any therapeutic basis for it, regardless of its nontherapeutic consequences. A guardian concerned only with medical consequences, therefore, could completely undermine the other safeguards against forced medication set forth today by this court.

Depending upon the circumstances of a particular case and the individual involved, a number of persons or organizations may properly serve as a guardian of the person. A close family member, for example, often may be the most appropriate candidate. A stranger, on the other hand, may be less desirable, both because of a lack of personal knowledge about the accused and because of the public's perception of him or her as an agent of the state. History has documented the practices of authoritarian governments administering mind altering drugs in order to advance state interests, and we should tread lightly in such a sensitive area. As Justice Kennedy noted, "medication of the type here prescribed may be for the very purpose of imposing constraints on the defendant's own will, and for that reason its legitimacy is put in grave doubt." *Riggins* v. *Nevada,* 504 U.S. 127, 145, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992) (Kennedy, J., concurring).

The majority dismisses the Connecticut Legal Rights Project, Inc. (Project), as a candidate because that organization "represent[s] clients in accordance with their expressed preferences." The issue of whether the Project is or is not an appropriate candidate is not before this court. Neither party has briefed this issue, nor has the Project been asked to respond. Instead, the majority has decided, sua sponte and without the benefit of informed argument, that the Project is not an appropriate organization to serve as guardian. Although I note that the amicus brief filed by the Project indicates that the organization also is concerned with the dignity, privacy and "integrity of body and mind" of a person with a mental disability, I would not, on the basis of the record before us, decide whether the Project is or is not an appropriate candidate.

opinion fails to place sufficient emphasis upon the requirement that there be a sound medical basis for treating the criminal defendant with antipsychotic drugs. Furthermore, the majority opinion fails to take into account adequately that the defendant's right to receive a fair trial may be infringed if he is forced to undergo a trial while so medicated.

At the outset, I express my agreement with the majority that the state has a legitimate interest in attempting to restore a criminal defendant's competence so that he can be tried for the crimes of which he is accused. As Justice Brennan wrote, "[t]he safeguards that the Constitution accords to criminal defendants presuppose that government has a sovereign prerogative to put on trial those accused in good faith of violating valid laws. Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace." *Illinois* v. *Allen,* 397 U.S. 337, 347, 90 S. Ct. 1057, 25 L. Ed. 2d 353, reh. denied, 398 U.S. 915, 90 S. Ct. 1684, 26 L. Ed. 2d 80 (1970) (Brennan, J., concurring). Nevertheless, a person's rights to privacy and due process require that the state make an extraordinary showing before it may be allowed to administer antipsychotic drugs against the wishes of a criminal defendant. Like Justice Kennedy, I have "doubt that the showing can be made in most cases, given our present understanding of the properties of these drugs." *Riggins* v. *Nevada,* 504 U.S. 127, 139, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992) (Kennedy, J., concurring).

I

According to the majority, in order for the state to override the defendant's right to remain free from unwanted medication, it must prove certain factors "that assist in the measurement and weighing of the defendant's privacy interests at stake." The majority,

however, seems to delimit the defendant's privacy interest merely to that of whether "the proposed drug regimen will not cause an unreasonable risk to the defendant's health." I disagree that a person's fundamental right to remain free from unwanted medical treatment—especially treatment so drastic as forced medication with antipsychotic drugs—is so limited. Rather, I believe the trial court, in deciding whether to override a criminal defendant's fundamental right to remain free from unwanted mind altering drugs, must also consider whether there is "a sound medical basis for the treatment."[3] Id., 140 (Kennedy, J., concurring).

In determining whether there is a sound medical basis for treating the defendant with antipsychotic drugs, the trial court must take into account such considerations as the nature of the defendant's mental illness, the probability of successful treatment of that illness, the risk of harm to the defendant and the potential side effects of the medication. In the present case, on the basis of the record before us, which includes the testimony of forensic psychiatrist Kenneth Selig, I have serious reservations about whether the state clearly and convincingly has proved, or, on remand, will be able to prove, that there is a sound medical basis for treating the defendant against his will with antipsychotic drugs.[4]

---

[3] The majority, in response to this concurrence, now states in footnote 31 of its opinion that it fully intends that the state must meet this standard. Accordingly, when the majority opinion states that the state must prove that "the proposed drug regimen will not cause an unreasonable risk to the defendant's health," it actually means that the state must prove, in the first instance, by clear and convincing evidence, that there is a sound medical basis for the administration of the drugs. With this element of the test so clarified, I agree.

[4] In his brief before this court, the defendant summarized Selig's testimony as follows:

"(1) Mr. Garcia's condition was consistent with either or both brain dam-

Selig testified, for example, that the defendant's mental illness could have been caused by *either* a psychiatric disturbance, such as schizophrenia, or organic brain damage attributable to years of alcohol abuse.[5] If the defendant's illness was the result of organic brain damage, forced medication would not be effective to return him to a level of competence necessary to allow the state to bring him to trial. On the contrary, according to Selig, forcibly medicating a patient with organic brain damage is only useful to prevent the person from being agitated or aggressive. The evidence in this case clearly shows that the defendant does not need medication for this purpose.[6] Indeed, the defendant has not

---

age related to alcohol abuse or a psychiatric disturbance that could be schizophrenia or some other paranoid disorder. . . .

"(2) The only value of antipsychotic medications in brain-damaged people is to control agitation or aggressive behavior-issues *not very important* to Mr. Garcia (emphasis added). . . .

"(3) The percentage of success with antipsychotics with respect to cognitive capacities are as follows: approximately one third of people who are given antipsychotic medications *of the proper type at the proper dosage to the proper length of time* considerably improve, about one third stay the same, and about one third get worse (a general kind of global analysis of all schizophrenic patients *uncomplicated by alcohol or drug abuse or other problems)* (emphasis added). . . .

"(4) While most people who are forcibly medicated are ultimately appreciative, a significant percentage resent the intrusiveness, side effects and humiliation, especially those such as Mr. Garcia who are paranoid. . . .

"(5) There are approximately 25 different types of medication; experimentation is required to establish the proper medication and proper dosage. . . .

"(6) The procedure of forcible medication often requires the patient to be held down by large male staff and forcible injections up to four times per day. The procedure can be emotionally deleterious to both staff and patient, there being no sense of alliance for the patient with the treatment team. Further, it can be emotionally traumatic to the patient even if he/she agrees to take the medication orally. . . .

"(7) Although antipsychotic medication would probably be the best mode of treatment for Mr. Garcia, there is no very good treatment for paranoid delusions. . . ."

[5] The state's expert, psychiatrist Earl Biassey, agreed that the source of the defendant's psychosis is undetermined.

[6] As Justice Kennedy pointed out in *Riggins* v. *Nevada*, supra, 504 U.S. 140–41, different legal standards apply under the federal constitution when

attempted to hurt others or himself since being confined to the Whiting Forensic Institute for evaluation and treatment. On the basis of this record, therefore, I have doubts whether there is a sound medical basis for the state's attempts to treat the defendant with mind altering drugs.

## II

The standards advanced by the majority also do not fully take into account an important due process right of the accused—that is, the right to receive a fair trial. As Justice Kennedy pointed out in *Riggins*, although antipsychotic drugs can have beneficent effects upon the mentally ill, their side effects also can compromise a criminal defendant's right to a fair trial. "The drugs can prejudice the accused in two principal ways: 1) by altering his demeanor in a manner that will prejudice his reactions and presentation in the courtroom, and 2) by rendering him unable or unwilling to assist counsel." *Riggins* v. *Nevada*, supra, 504 U.S. 142 (Kennedy, J., concurring). I shall discuss these in turn.

## A

It is fundamental that "[a]t all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial. If the defendant takes the stand . . . his demeanor can have a great bearing on his credibility, persuasiveness, and on the degree to which he evokes sympathy." Id. (Kennedy, J., concurring).

---

the purpose of the involuntary medication is to ensure that the incarcerated person ceases to be a physical danger to himself or others. See *Washington* v. *Harper*, 494 U.S. 210, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990).

The side effects of antipsychotic drugs may include restlessness, tremors of the limbs, a diminished range of facial expression, a "sedation-like effect" that can affect the thought process, and drowsiness. Id., 142–43 (Kennedy, J., concurring); see also *Washington* v. *Harper*, 494 U.S. 210, 229–30, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990). "As any trial attorney will attest, serious prejudice could result if medication inhibits the defendant's capacity to react and respond to the proceedings and to demonstrate remorse or compassion. The prejudice can be acute during the sentencing phase of the proceedings, when the sentencer must attempt to know the heart and mind of the offender and judge his character, his contrition or its absence, and his future dangerousness. In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies. See [W.] Geimer & [J.] Amsterdam, 'Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases,' 15 Am. J. Crim. L. 1, 51–53 (1987-1988)." *Riggins* v. *Nevada*, supra, 143–44 (Kennedy, J., concurring).

This very problem was brought home in striking fashion in this court's recent case of *Gold* v. *Warden*, 222 Conn. 312, 610 A.2d 1153 (1992). In that case, which involved the petitioner's competency to stand trial, Walter Borden, a forensic psychiatrist, testified about the high dosage of Navane, a tranquilizer, that the state had administered to the petitioner. According to Borden, the twenty milligram dosage "made the petitioner more apathetic, somnolent and unresponsive. He further testified that the 'twenty milligrams for a maintenance dosage of Navane is high. It would tranquilize him no doubt. It would control his behavior. It reflected in the records and my examination, [that it] would interfere with his comprehension, with his awareness, with his ability to respond. It certainly would help

him behave in the courtroom if sitting and not creating a disturbance is what is desired and that's all.' "
Id., 328 (*Berdon, J.,* dissenting).

In *Gold,* the petitioner's former attorney happened to be in the courtroom on one of the days when the petitioner was being tried. He later testified that, "I was struck by the fact that [Gold] seemed to be in a trance. He was staring straight ahead. He wasn't reacting to anything going on in the courtroom. He did not even react to my presence in the courtroom. . . . His eyes were open but he wasn't moving. He was simply occupying a chair." (Internal quotation marks omitted.) Id., 316.

In addition, the effect of the medication on the petitioner in *Gold* v. *Warden,* supra, 316–17, was underscored by the following colloquy, which took place during the petitioner's criminal trial between the prosecutor, the assistant defense counsel and the trial court:

" 'Mr. Scanlon [prosecutor]: If Your Honor please, I think that the defendant's confrontation rights are being abandoned at this moment. I point that out to the court.

" 'The Court: Excuse me?

" 'Mr. Scanlon: I think his confrontation rights are being abandoned voluntarily by the defendant. I did want to point this out to Your Honor.

" 'The Court: Why?

" 'Mr. Scanlon: He seems to be sleeping.

" 'Mr. Serignese [assistant defense counsel]: No, he is not.

" 'Mr. Scanlon: He seems to be sleeping.

" 'Mr. Serignese: He's just resting his eyes. He is not sleeping.

" 'The Court: No, the record will note that he, the defendant, is awake.

" 'Mr. Scanlon: His eyes are closed. Excuse me.

" 'The Court: Proceed.' "

The accused in a criminal trial has the right to present himself to the jury—in speech, appearance and personality—as he really is at the time of trial, and probably was at the time he allegedly committed the crime. In other words, he has the right to be himself without modification of his personality through the forced administration of antipsychotic drugs. Indeed, this is an especially important consideration in cases where the defendant seeks to prove, as an affirmative defense, that he lacked capacity due to a mental disease or defect; see General Statutes § 53a-13; or that he committed murder while under the influence of an extreme emotional disturbance. General Statutes § 53a-54a (a). In such cases, it may be important for the fact finder to perceive the defendant in his unmodified personality. Therefore, the state must prove, by clear and convincing evidence, that the administration of the antipsychotic drugs will not adversely affect the demeanor, appearance or personality of the defendant.[7]

---

[7] I do not agree with the majority's suggestion in footnote 19 that a trial court need only consider the effects of the mind altering drugs on a defendant's personality and demeanor at the time of trial, *after* the state has administered the drugs. According to the rationale of the majority, the state first can drug the defendant and then determine if the drugs will allow him to be brought to trial. By that time, however, the defendant will already have been deprived of his privacy right in being free from unwanted medication. This is, quite simply, putting the cart before the horse.

In my view, in order for the state to override the defendant's privacy interest in the first instance, it must prove clearly and convincingly that by administering the drugs the state *will* be able to bring the defendant to trial. Such proof must include evidence that the drugs will not adversely affect the defendant's demeanor and personality in such a way as to preclude a fair trial. To hold that the state may make this showing after the fact, at the time of trial, serves only to cheapen the right of privacy of an accused to be free from unwanted medication.

## B

In addition, forced medication may implicate a defendant's right to receive a fair trial by hindering his ability to assist in his own defense. The medication may produce such a result in at least two ways.

First, a defendant "must be able to provide needed information to his lawyer and to participate in the making of decisions on his own behalf. The side effects of antipsychotic drugs can hamper the attorney-client relation, preventing effective communication and rendering the defendant less able or willing to take part in his defense. The State interferes with this relation when it administers a drug to dull cognition." *Riggins* v. *Nevada,* supra, 504 U.S. 144 (Kennedy, J., concurring). Second, the unwanted medication may hinder the defendant's ability to testify or to be alert during the prosecutor's cross-examination of him. Indeed, in this court's case of *Gold* v. *Warden,* supra, 222 Conn. 312, the forensic psychiatrist, Borden, testified that the petitioner's ability to assist in his own defense had been impaired. Id., 328 (*Berdon, J.*, dissenting). According to Borden, the petitioner "told me, in my examination of him, that he was kind of unclear about the trial. He thought it was going to go on, and all of a sudden, it was over. And he said he never got a chance to explain, or to question, or to say—he thought that would come up later about the evidence which he was convinced would exonerate him, and he said all of a sudden, it was over." Id., 328 n.5 (*Berdon, J.*, dissenting).

The majority now states in footnote 29, in response to this concurrence, that it never intended to allow the state forcibly to administer drugs to a defendant if the medication would interfere with his ability to assist in his own defense. Accordingly, when the majority states

that the state must demonstrate that drugs forcibly administered to a defendant "will render him competent to stand trial," the majority actually means the following: The state must prove by clear and convincing evidence not only that the drugs will render the defendant competent to stand trial, but also that the effects of the drugs will not interfere with his right to a fair trial, including his right to assist in his own defense. With this, I also agree.

In sum, due process of law, in the context of a defendant's right to receive a fair trial, requires the state to prove clearly and convincingly that the drugs will neither alter the defendant's demeanor or ability to react in a manner that will prejudice him, nor make him unable or unwilling to assist in his own defense.

### III

I agree with Justice Kennedy's summary of his position in *Riggins*: "If the State cannot render the defendant competent without involuntary medication, then it must resort to civil commitment, if appropriate, unless the defendant becomes competent through other means. If the defendant cannot be tried without his behavior and demeanor being affected in this substantial way by involuntary treatment, in my view the Constitution requires that society bear this cost in order to preserve the integrity of the trial process. The state of our knowledge of antipsychotic drugs and their side effects is evolving and may one day produce effective drugs that have only minimal side effects. Until that day comes, we can permit their use only when the State can show that involuntary treatment does not cause alterations raising the concerns enumerated in this separate opinion." *Riggins* v. *Nevada*, supra, 504 U.S. 145 (Kennedy, J., concurring).

Subject to these concerns, I concur in the result.[8]

[8] In addition to raising these claims under the federal constitution's due process clause, the defendant also argues that the forcible administration of antipsychotic drugs violates his common law right to privacy. I agree, and would hold that the standards we set forth today under the federal due process clause apply with equal force to the defendant's right under the state common law.

Our case law makes clear that the common law of Connecticut recognizes that an individual has a fundamental privacy right in making his or her own choice about whether to receive medication. Chief Justice Peters, writing for the court in *McConnell* v. *Beverly Enterprises–Connecticut, Inc.,* 209 Conn. 692, 701, 553 A.2d 596 (1989), acknowledged that "[t]he right to refuse medical treatment is a right rooted in this nation's fundamental legal tradition of self-determination. In 1891, for example, the United States Supreme Court stated, '[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' *Union Pacific Railway Co.* v. *Botsford,* 141 U.S. 250, 251, 11 S. Ct. 1000, 35 L. Ed. 734 (1891) (court cannot order plaintiff to undergo surgical examination). Additionally, although the United States Supreme Court has not yet addressed the issue, the Fourth Circuit Court of Appeals has stated, '[t]he right to be free of unwanted physical invasions has been recognized as an integral part of the individual's constitutional freedoms, whether termed a liberty interest protected by the Due Process Clause, or an aspect of the right to privacy contained in the notions of personal freedom which underwrote the Bill of Rights. The right to refuse medical treatment has been specifically recognized as a subject of constitutional protection.' *United States* v. *Charters,* 829 F.2d 479, 491 (4th Cir. 1987) (right to refuse antipsychotic medication)." This "common law right to refuse medical treatment is not absolute, and, in some cases, may yield to a compelling state interest." Id., 716 (*Healey, J.,* concurring). Accordingly, I would hold that, independent of any federal constitutional guarantees, the defendant's right to be free from antipsychotic medication also is rooted in the common law of this state. The state may overcome this right by satisfying, by clear and convincing evidence, the test outlined in the majority opinion and in this concurrence.

Acknowledging the defendant's right, under the adequate and independent ground of our state common law, to be free from forced medication allows this court to determine conclusively the nature of the defendant's right and under what circumstances the interests of the state may outweigh this right. *Michigan* v. *Long,* 463 U.S. 1032, 1041, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983) ("If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, [the United States Supreme Court], of course, will not undertake to review the decision."). By tying its standards only to the

uncharted waters of federal jurisprudence, this court leaves open the possibility that the United States Supreme Court will, at some point in the future, either shrink the nature of the right or expand the circumstances under which the state may administer drugs against the defendant's will. Indeed, in *Riggins,* the United States Supreme Court explicitly left open the question of under what conditions a state may forcibly medicate a criminal defendant with antipsychotic drugs. Anchoring this right to the state's common law, however, would allow this court to "protect the rights and liberties of our people, however the philosophy of the United States Supreme Court may ebb and flow." *State* v. *Jewett,* 500 A.2d 233, 235 (Vt. 1985).